In re BRIDGESTONE/FIRESTONE, INC. TIRES PRODUCTS LIABILITY LITIGATION.

No. IP–00–9373–C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

July 27, 2001.

Don Barrett, Barrett Law office, PA, Lexington, MS, Victor Manuel Diaz, Jr., Podhurst Orseck Josefberg & Eaton, Miami, FL, Mike Eidson, Colson Hicks Eidson, Coral Gables, FL, Irwin B. Levin, Cohen & Malad, Indianapolis, IN, William E. Winingham, Wilson Kehoe & Winingham, Indianapolis, IN, for Plaintiffs.

John H. Beisner, O'Melveny & Myers LLP, Washington, DC, Daniel P. Bryon, McHale Cook & Welch, PC, Indianapolis, IN, Mark Herrmann, Jones Day Reavis & Pogue, Cleveland, OH, Thomas S. Kilbane, Squire Sanders & Dempsey LLP, Cleveland, OH, Mark Merkle, Krief Devault Alexander & Capehart, Indianapolis, IN, Randall Riggs, Locke Reynolds, LLP, Indianapolis, IN, Colin P. Smith, Holland & Knight LLP, Chicago, IL, Thomas G. Stayton, Baker & Daniels, Indianapolis, IN, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART THE MOTION TO DISMISS THE MASTER COMPLAINT

BARKER, District Judge.

This cause is before the Court on the Motion to Dismiss the Master Complaint in this Multi District Litigation ("MDL"), filed by defendants Bridgestone/Firestone, Inc., ("Firestone") and Ford Motor Company ("Ford"). The motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motion for the reasons set forth below.[1]

### BACKGROUND

The Master Complaint, which was filed in this Court on January 2, 2001, combines dozens of class action complaints involving Firestone tires that were filed in or removed to federal district courts throughout the country and transferred to this MDL

---

**1.** The Court has addressed the issue of federal preemption under the Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq.,* raised in the motion to dismiss Plaintiffs' Eighth Claim for Relief in a separate Order issued simultaneously with this ruling.

proceeding. The named Plaintiffs in the Master Complaint are residents of 27 different states[2] who seek to represent a class ("the Tire Class") essentially consisting of "all persons and entities in the United States who now own or lease, or owned or leased, vehicles that are or were equipped with Firestone-brand ATX, ATX II, Firehawk ATX, ATX 23 Degree, Widetrack Radial Baja, Wilderness, or other comparably designed or manufactured Firestone-brand, steel-belted radial tires" ("the Tires") and a separate class ("the Explorer Diminution Class")[3] essentially consisting of "all persons and entities in the United States who now own or lease, or owned or leased, Ford Explorer sport-utility vehicles, regardless of the tires with which those Explorers were equipped."[4] Defendant Firestone is an Ohio corporation with its principal place of business in Nashville, Tennessee. Defendant Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan.[5]

The specific claims asserted in the Master Complaint are set out in detail below, but in general Plaintiffs allege that the Tires are defective due to their design and/or method of manufacture. The defect causes the Tires to have "an unreasonably dangerous propensity to suffer complete or substantial tread separation or 'belt leaves belt' separation." Master Complaint, ¶ 4. In addition, Plaintiffs allege that certain models of the Ford Explorer have "significant handling and stability defects" which created "a substantial risk of rollovers and other safety problems." *Id.*, ¶¶ 63–66, 70. In order to compensate for these stability defects, Plaintiffs allege that Ford and Firestone agreed to lower the recommended tire pressure on the Firestone tires that were used as original equipment on the Explorer. This had the effect of lowering the likelihood of rollover accidents, but also had the effect of exacerbating the tire defect and "substantially increas[ing] the risk of tread separation and other catastrophic tire failures." *Id.* at ¶¶ 70–71.

The Master Complaint asserts federal claims pursuant to the Magnuson–Moss Warranty Act, 15 U.S.C. § 2310(d)(1), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and pendent state law claims for unjust enrichment, breach of express warranty, breach of implied warranty, negligence, violation of consumer protection statutes, and redhibition (under Louisiana statute). The Master Complaint specifically excludes any claims for personal injury or wrongful death resulting from accidents caused by the alleged defects; rather, it seeks remedies for those Tire and Explorer owners who have not been involved in accidents, but allegedly have suffered injury simply because they own(ed) or lease(d) defective vehicles or vehicles with defective tires.

---

2. The named Plaintiffs reside in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, and West Virginia.

3. The Court has not yet ruled on Plaintiffs' Motion for Class Certification. We use these terms throughout this Order simply to describe the allegations of the Master Complaint.

4. The Master Complaint proposes various subclasses. Except where specifically noted, the subclasses are not relevant to the resolution of this motion to dismiss.

5. Defendant Bridgestone Corporation ("Bridgestone"), the Japanese parent company of Firestone with its principal place of business in Tokyo, Japan, disputes this Court's jurisdiction over it and has not joined in the instant motion to dismiss.

## *ANALYSIS OF DEFENDANTS' MOTION TO DISMISS*

### I. Choice of Law

■ Defendants have moved to dismiss the Master Complaint on a variety of grounds. Before addressing any of the arguments raised by Defendants, we must first determine the appropriate law to apply to each of Plaintiffs' claims. For the federal claims asserted in the Master Complaint, the answer is relatively straightforward: for any questions of federal law about which federal circuits disagree, this Court, as the transferee court, applies the law of the federal circuit in which it sits, in this case the Seventh Circuit. *In re Korean Air Lines Disaster of September 1, 1983,* 829 F.2d 1171, 1176 (D.C.Cir.1987) ("[T]he law of a transferor forum on a federal question ... merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit."), *judgment aff'd. by Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1126 (7th Cir.1993) ("We agree with *Korean Air Lines* that a transferee court normally should use its own best judgment about the meaning of federal law when evaluating a federal claim....").

■ The choice of law issue for the state law claims in the Master Complaint is more complex, however. The threshold question is whether the relevant substantive laws of the different states involved are sufficiently different to require a choice of law analysis. *See Jean v. Dugan,* 20 F.3d 255, 260 (7th Cir.1994) (citation omitted) ("This court has held that before 'entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' ").

We conclude that Defendants have demonstrated such differences in the relevant states' laws.

■ We move to the next question, that is, which state's choice of law analysis should be used. Guidance is provided by the Seventh Circuit's holding that the choice of law rules of the forum state must be applied to determine the appropriate law to be applied to state law claims, whether they are premised on diversity of citizenship or are pendent to federal claims. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 681 (7th Cir.1986). In MDL proceedings, the forum state generally is the state in which the transferor court of each individual action sits; in other words, the transferee court must make an independent choice of law determination for each state from which a case was transferred into the MDL proceeding. *See In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979,* 644 F.2d 594, 610 (7th Cir.1981) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *In Re Air Crash Disaster at Boston, Mass., on July 31, 1973,* 399 F.Supp. 1106 (D.Mass.1975)). However, the parties agree that this Court should be treated as the forum court because Plaintiffs filed their Master Complaint in this Court. Indiana's choice of law rules therefore are applicable.

### A. Law Applicable to Plaintiffs' Tort Claims

■ The Master Complaint asserts a common law negligence claim, as well as a claim for violation of state consumer protection statutes, the latter of which we view to be most closely analogous to a common law tort claim for fraudulent misrepresentation and therefore subject to the choice of law analysis for tort claims.[6]

**6.** Courts consistently examine the specific

claims made in a particular case to determine

Indiana follows a modified form of the traditional *lex loci delicti commissi* rule in analyzing the choice of law question in tort cases. *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071 (Ind.1987). Under the traditional rule, the substantive law of the "place of the tort" is applied-that is, the state in which the last event necessary to make the defendant liable for the alleged wrong took place, typically the state in which the injury occurred. *Id.* at 1073. Under the modified rule established by the Indiana Supreme Court in *Greeson*, this rule applies unless the place of the tort "bears little connection to the legal action." In those cases, other factors are considered, such as:

1) the place where the conduct causing the injury occurred;

2) the residence or place of business of the parties; and

3) the place where the relationship between the parties is centered.

*Id.* at 1073–74 (citing *Restatement (Second) of Conflicts of Laws* § 145(2) (1971)). "These factors should be evaluated according to their relative importance to the particular issues being litigated." *Id.* at 1074.

Following the dictates of *Greeson*, we begin our choice of law analysis for the tort claims in the Master Complaint by determining the place of the tort for each named Plaintiff. As noted above, the place of the tort typically is the state in which the injury to the plaintiff occurred. In this case, Defendants argue, and Plaintiffs do not dispute, that any injury suffered by Plaintiffs occurred in each Plaintiff's home state, or perhaps more precisely in the state in which each Plaintiff purchased an Explorer or one or more of the Tires.

Whether these states "bear little connection" to this litigation turns on the nature of the tort claims in this action. The essence of Plaintiffs' tort claims is that Defendants were negligent in "designing, manufacturing, advertising, and selling" vehicles and tires that were unreasonably dangerous. Master Complaint, ¶ 327. This negligence allegedly caused Plaintiffs to suffer actual damages and has threatened them with "irreparable harm by undue risk of physical injuries or death." *Id.* at ¶ 329. Plaintiffs also allege that Defendants violated "any and all state consumer protection statutes"[7] in a number of ways,

---

whether a claim under a consumer protection statute should be treated as a tort or a contract action for choice of law purposes. *See, e.g., Hiller v. Manufacturers Product Research Group of North America, Inc.*, 59 F.3d 1514, 1537 (5th Cir.1995) (plaintiffs' claim under Texas Deceptive Trade Practices Act sounded in tort); *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1 (1st Cir.1994) (plaintiff's claim under Massachusetts's unfair trade practices law treated as tort claim for choice of law purposes because it resembled tort of fraudulent misrepresentation); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 213 (E.D.Pa. 2000) (noting that claims under consumer fraud statutes may be based either in tort or contract law, and finding that "tort law is more appropriately applied considering the facts of this case" and therefore conducting a tort choice of law analysis to determine which state's statute should be applied); *Griffin v. Security Pacific Auto. Finan. Servs. Corp.*, 25

F.Supp.2d 1214, 1216 (D.Kan.1998) (applying, without comment, Kansas tort choice of law analysis to determine which state's consumer protection statute applied); *Mead Corp. v. Stevens Cabinets, Inc.*, 938 F.Supp. 87, 89 (D.Mass.1996) (finding that plaintiff's claim under Massachusetts consumer protection statute was "no more than a dressed-up breach of contract or breach of warranty claim" rather than a "separate, tort-based theory of fraud").

7. The Master Complaint's Tenth Claim for Relief is entitled "Violation of all States' Consumer Protection Statutes." The complaint does not specifically cite any state's statute. In their brief in response to the motion to dismiss, Plaintiffs argue that the Tennessee Consumer Protection Act applies to their claims against Firestone and the Michigan Consumer Protection Act applies to their claims against Ford.

including by representing "through their advertising, warranties, and other express representations, that the [Firestone tires] and Explorers had benefits or characteristics that they did not actually have." *Id.* at ¶ 308. Plaintiffs therefore seek compensatory and punitive damages as well as equitable relief.

The basic factual allegations[8] in the Master Complaint relating to Plaintiffs' tort claims are as follow:

1. The Firestone tires at issue are defective due to their design and/or method of manufacture. The defect causes the tires to have "an unreasonably dangerous propensity to suffer complete or substantial tread separation or 'belt leaves belt' separation." Master Complaint, ¶ 4.

2. Ford designed, marketed and sold the Explorer with "significant handling and stability defects" which created "a substantial risk of rollovers and other safety problems." *Id.* at ¶¶ 63–66, 70.

3. Ford's engineers recommended certain design modifications that would correct these defects, but Ford did not implement those changes because they would have caused a delay in production of the Explorer. *Id.* at ¶ 70.

4. Instead of implementing the modifications recommended by their engineers, Ford, with Bridgestone and Firestone's agreement, utilized a "quick fix" to the Explorer's rollover problem: it lowered the tire pressure on the Firestone tires used as original equipment on the Explorer. This had the effect of lowering the likelihood of rollover accidents, but also had the effect of exacerbating the tire defect and "substantially increas[ing] the risk of tread separa-

tion and other catastrophic tire failures." *Id.* at ¶¶ 70–71.

5. Defendants failed to conduct safety tests on the Explorer with the lowered tire pressure. *Id.* at ¶ 78.

6. Defendants knew that the Explorer's weight capacity of 750 to 1310 pounds, depending on the model, was likely to be exceeded with normal use of the vehicle, thereby further increasing the risk of tire failure. *Id.* at ¶ 77.

7. Defendants knew of the defects in the Firestone tires and the Explorer and the fact that they had caused numerous accidents resulting in serious injuries and death, especially in hot weather climates, but chose to "cover up" those defects for several years before finally announcing a limited recall in August 2000. *Id.* at ¶¶ 79–93.

8. The August 2000 recall was inadequate because it did not include all models of Firestone tires with the tread separation defect. *Id.* at ¶ 105.

9. Ford has increased its recommended tire pressure for Explorers, forcing Explorer owners into "a potentially deadly catch 22" of choosing between the higher tire pressure, which leads to a higher rollover risk, or the lower tire pressure, which leads to a higher tread separation risk. *Id.* at ¶¶ 120–21.

10. Defendants made fraudulent misrepresentations in their national advertising campaigns regarding the "features, safety, quality, and value" of the Firestone tires and Explorers which induced the Plaintiffs to purchase or lease them. *Id.* at ¶ 122.

---

**8.** This summary of Plaintiffs' allegations is in no way intended to be exhaustive.

An examination of these allegations indicates that the place where each allegedly defective tire and/or Explorer was purchased or used is insignificant to Plaintiffs' claims. All of the alleged tortious conduct took place at each Defendant's principal place of business—Michigan for Ford, Tennessee for Firestone. Ford and Firestone sell their products in every state in the nation. The place where each Plaintiff purchased his or her vehicle or tire is entirely irrelevant to Plaintiffs' tort claims, as evidenced by the fact that, under Plaintiffs' theory, each Plaintiff would have suffered the identical injury wherever he or she purchased or used the defective tire or vehicle. Thus, we conclude that any place where the tort manifested itself other than the point of manufacturing and marketing has little connection to the tort claims in the Master Complaint.

This result is consistent with Indiana cases and federal cases applying Indiana law. For example, in *KPMG Peat Marwick v. Asher*, 689 N.E.2d 1283 (Ind.Ct. App.1997), a class of nearly 600 Indiana farmers sued the accounting firm of KPMG Peat Marwick ("Peat Marwick") for negligently auditing the financial statements of Merchants Grain, Inc. ("MGI"), a company that operated grain elevators in Indiana and other states. MGI filed bankruptcy after failing to pay for the grain the farmers deposited in MGI's elevators. The farmers alleged that Peat Marwick's negligent audit of MGI permitted MGI to renew its federal license to operate grain elevators, and that "had the financial statements fairly portrayed the financial condition of MGI in all material respects, MGI

would not have been eligible for USDA licensing." *Id.* at 1285. The court applied the Indiana choice of law rule for tort claims as set forth in *Greeson*. The parties agreed that the place of the tort was Indiana, and the defendant argued that Indiana had a significant connection to the lawsuit because the plaintiffs were farmers who resided in Indiana and deposited their grain in elevators located in Indiana in "alleged reliance upon the existence of a USDA license posted on the wall" in Indiana. The court, however, disagreed, noting that:

> Designated evidence indicated the audit was prepared by Peat Marwick in Missouri, for a client whose principal place of business was Missouri, for submission to a Missouri office of USDA, which office then relicensed MGI. The presence of these facts in an action for accountant negligence render insignificant, in a choice-or-law [sic] analysis, the Indiana nature of the farmers' contacts.

*Id.* at 1287. In other words, because all of the defendant's conduct relevant to the plaintiffs' tort claims took place in Missouri, and the plaintiffs would have suffered the same injury whether they had deposited their grain in Indiana or in an MGI elevator located in another state, the court determined that Indiana's connection to the lawsuit was insignificant. *See also Castelli v. Steele*, 700 F.Supp. 449 (S.D.Ind.1988) (finding that the place of the tort, Illinois, bore little connection to a medical malpractice action filed by an Illinois resident who received alleged negligent medical care while in Indiana and negligent advice in Illinois over the phone from the same Indiana doctor).[9]

---

9. Contrast the cases cited above with the following cases in which courts have held that the place of the tort did bear a significant connection to the lawsuit: *Cox v. Nichols*, 690 N.E.2d 750 (Ind.Ct.App.1998) (place where automobile collision occurred bore significant connection to lawsuit arising out of the collision); *Tompkins v. Isbell*, 543 N.E.2d 680,

682 (Ind.Ct.App.1989) (same, because "[t]he parties' conduct in operating their motor vehicles prior to the collision will be the focus of attention to determine liability"); *Bencor Corp. v. Harris*, 534 N.E.2d 271, 273 (Ind.Ct. App.1989) (Plaintiff, a Tennessee resident, was injured while working on a construction job in Indiana for his Tennessee employer;

■ Because in this case any place other than where the Tires and the Explorers were manufactured bears no significant connection to the Plaintiffs' tort claims, *Greeson* instructs that we must consider other factors to determine the appropriate law to apply, such as: the place where the conduct causing the injury occurred, the residence or place of business of the parties, and the place where the relationship between the parties is centered. These and any other relevant factors are to be evaluated "according to their relative importance to the particular issues being litigated." *Greeson*, 515 N.E.2d at 1074.

Applying the *Greeson* factors to this case, we note that the named Plaintiffs reside in 27 different states, and the proposed classes include residents of all 50 states and the District of Columbia. However, as discussed in detail above, we find no basis on which to conclude that the residences of Plaintiffs are important to this litigation. Neither is the fact that Firestone, by virtue of its place of incorporation, is an Ohio corporation or that Ford is a Delaware corporation. Further, the relationship between the parties is simply that of buyer and seller; while Plaintiffs allegedly were injured because they bought Defendants' products, the place where they were purchased is not significant to a Plaintiff's tort claims. What is significant, and what will be the focus of this litigation, is the conduct of Defendants as manufacturers. As set forth above, Plaintiffs assert, and Defendants do not dispute, that virtually all of the alleged tortious conduct by the Defendants took place at each Defendant's principal place of business-Michigan for Ford and Tennessee for Firestone. In short, that is where the allegedly defective tires and Explorers were designed; that is where Ford allegedly made the decision not to institute the design changes recommended by its engineers, but rather to lower the recommended tire pressure for the Explorer; that is where decisions regarding advertising were made; and that is where all decisions regarding the scope of the recall were made. Just as the court in *Asher* determined that Missouri law should apply because Missouri was "the place where virtually all of the acts of the alleged negligent audit occurred," 689 N.E.2d at 1287, and the court in *Castelli* determined that Indiana law should apply because all of the defendant-doctors' alleged negligent actions occurred in Indiana, 700 F.Supp. at 454–44, this court determines that, for purposes of Plaintiffs' tort claims, the law of Michigan should apply to Ford and the law

court held that because "the performance of the construction contract, the direction of the workman, the instrumentality that caused injury, the alleged negligence, and the injury all occurred in Indiana" and "Indiana safety and building codes" were also at issue, Indiana had a significant connection to the tort claim.); *Judge v. Pilot Oil Corp.*, 205 F.3d 335, 337 (7th Cir.2000) (in wrongful death action involving shooting in Indiana, the place of shooting—"the last (and only) event making the defendants liable"—was significant, in that "the parties' conduct in Indiana that resulted in David's death will be the key element to determine if the defendants should be held accountable for David's death"); *Kamel v. Hill–Rom Co., Inc.*, 108 F.3d 799, 805 (7th Cir.1997) (the place of the tort, Saudi Arabia, had a significant connection to Saudi citizen's claim against Indiana corporation for various torts arising out of agreement that plaintiff would promote, market and sell defendant's products in Saudi Arabia; Saudi Arabia was residence of plaintiff and one of the defendants and was "the locale where the parties conducted their ongoing business relationship"); *but see In re Estate of Bruck*, 632 N.E.2d 745, 747–48 (Ind.Ct.App.1994) (Ohio, where automobile accident killed two Indiana residents, had an insignificant connection to the lawsuit because the deceased "had no connection with Ohio other than to make use of the Ohio Turnpike in travelling from New York to Indiana.").

of Tennessee should apply to Firestone. Further, Plaintiffs' claims for violation of state consumer protection statutes will be treated as a claim for violation of the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.901 *et seq.*, against Ford, and a claim for violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn.Code Ann. § 47–18–104 *et seq.*, against Firestone. To the extent that the Master Complaint purports to assert

claims under any other states' consumer protection statutes, those claims are hereby *DISMISSED.*[10]

## B. Law Applicable to Plaintiffs' Contract Claims

 In addition to their tort claims, Plaintiffs assert claims for breach of express warranty and breach of implied warranty. These claims, which are premised

**10.** Defendants, relying upon *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), argue in passing that this result would be unconstitutional. In *Shutts*, the Supreme Court reasserted its earlier holding in *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981), that " 'for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.' " *Shutts*, 472 U.S. at 818, 105 S.Ct. 2965 (quoting *Hague*, 449 U.S. at 312–13, 101 S.Ct. 633). It then applied that holding to the case before it, in which a Kansas court had applied Kansas law to a nationwide class action suit brought by gas company investors seeking to recover interest on royalties. The Court, noting that the defendant was not a resident of Kansas and that over 99% of the gas leases involved in the suit and some 97% of the plaintiffs had no connection at all to Kansas, found the blanket application of Kansas law to all of the plaintiffs' claims unconstitutional. This case clearly is factually distinguishable from *Shutts*. In our case, all of Plaintiffs' claims are connected to Michigan and/or Tennessee, because, as discussed above, virtually all of Defendants' actions relevant to Plaintiffs' claims took place in those states. In contrast, the vast majority of the plaintiffs' claims in *Shutts* had nothing at all to do with Kansas; they involved leases in other states held by plaintiffs who resided in other states, and nothing relevant to those plaintiffs' cases occurred in Kansas. Accordingly, *Shutts* does not dictate a finding that it would be constitutionally impermissible to apply only Tennessee and Michigan law to all of Plaintiffs' claims in this case.

Defendants also argue that the home states of Plaintiffs have a greater interest in having

their law applied to protect their residents than do the home states of Defendants. This may or may not be the case. Numerous states do apply a "governmental interests" test for choice of law, or at least treat as an important factor each state's relative interests in having its law applied to a particular cause of action. *See, e.g., Washington Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906, 103 Cal.Rptr.2d 320, 15 P.3d 1071, 1077 (2001) (Under California law, when an action involves claims of non-California residents, "the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law."); *Fu v. Fu*, 160 N.J. 108, 733 A.2d 1133, 1142 (1999) (noting that the competing interests of the relevant states is "the most significant factor in the tort field" in New Jersey choice of law analysis); *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C.1995) ("In determining which jurisdiction's law to apply in a tort case, we use the 'governmental interests' analysis, under which we evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review."); *American Family Mut. Ins. Co. v. Farmers Ins. Exch.*, 504 N.W.2d 307, 309 (N.D.1993) ("[T]he law of the jurisdiction whose 'interests are more deeply affected by the issues raised' should govern.") (citation omitted); *Barringer v. Idaho*, 111 Idaho 794, 727 P.2d 1222, 1226 (1986) ("[T]he conflict between the states' laws should be resolved rationally based upon the interests and policies of each state."). However, this factor is not determinative, or indeed generally even considered, by Indiana courts in making choice of law decisions in either tort or contract cases.

on sections of the Uniform Commercial Code, sound in contract, and therefore Indiana's choice of law rules for contract claims apply. *See Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562, 577 (Ind.Ct.App. 1986) (holding that warranty actions based on the Uniform Commercial Code sound in contract). In addition, Plaintiffs assert a claim for unjust enrichment, which is a quasi-contractual claim, and is therefore also analyzed under the choice of law rules for contracts. *See Community Care Centers, Inc. v. Sullivan*, 701 N.E.2d 1234, 1239 (Ind.Ct.App.1998) (describing claim for unjust enrichment as quasi-contractual in nature), *trans. denied* (1999); *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 741 (6th Cir.1999) (citation omitted) (noting that "Michigan's choice of law rules governing contract actions have also been applied to the quasi-contractual claim of unjust enrichment").

■ To determine the applicable law in a contract claim, Indiana courts " 'will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact.' " *Greeson*, 515 N.E.2d at 1073 (citation omitted). For all of the reasons noted in the previous discussion of Plaintiffs' tort claims, we conclude that Tennessee and Michigan have the most intimate contact with the facts relevant to Plaintiffs' breach of warranty claims against Firestone and Ford, respectively. While Defendants note that "Plaintiffs presumably negotiated and acquired their tires and/or vehicles, primarily used their equipment, and negotiated and received any repair or replacement in their home states," Reply

Brief I [11] at 9, these are not the most significant acts relevant to Plaintiffs' breach of warranty claims. In reality, there was no negotiation between the parties regarding either the warranties or the tire replacement under the recall. Indeed, under Plaintiffs' theories, it is entirely irrelevant where each Plaintiff purchased Defendants' products, used Defendants' products most regularly, or resided at the time of purchase or when the Master Complaint was filed. Therefore, it cannot be said that any of those states has the most intimate contacts with the facts of this case. Instead, the facts in dispute all center in Tennessee and Michigan, where Defendants made and executed their decisions regarding both the formation of and alleged breach of any applicable warranties. Therefore, we shall apply Tennessee law to Plaintiffs' contract-based claims against Firestone, and Michigan law to Plaintiffs' contract-based claims against Ford.

### C. Choice of Law Analysis Applied to Plaintiffs' Redhibition Claims

■ In addition to the claims discussed above, the Fourteenth Claim for Relief in the Master Complaint is a claim for breach of the warranty against redhibitory defects under Louisiana law.[12] Redhibition is the voidance of a sale of a consumer product on the ground that the product has a defect rendering it either useless or so imperfect that the buyer would not have originally purchased it. *Black's Law Dictionary* (7th Ed.1999). Louisiana courts generally treat such claims as contractual in nature. *See Scruggs v. Minton Equip. Co., Inc.*, 722 So.2d 130, 132 (La.App.1998) (stating that

---

**11.** Defendants filed their initial brief and reply brief in three parts, labeled I, II, and III.

**12.** This claim is asserted on behalf of a "Redhibition Subclass" consisting of "persons and

entities domiciled or residing in the State of Louisiana who bought or leased vehicles in Louisiana that are or were equipped with [the Tires]." Master Complaint, ¶ 137(f).

it is "well settled" that "[r]edhibition is based primarily in contract"); *but see Datamatic, Inc. v. International Business Machs. Corp.*, 613 F.Supp. 715, 718 (W.D.La.1985) (citing *Lartigue v. R.J. Reynolds Tobacco*, 317 F.2d 19 (5th Cir. 1963)) ("Redhibition cases have been aligned with tort actions in conflicts analysis."). Whether viewed as a contract or tort action, however, as noted above, Michigan and Tennessee law, not Louisiana law, apply to Plaintiffs' claims. Plaintiffs do not allege that a redhibition claim is viable under either Tennessee or Michigan law; therefore, Plaintiffs may not maintain an action for breach of warranty against redhibitory defects in this action, and Plaintiffs' fourteenth claim for relief is hereby *DISMISSED.*

## II. Standard Applicable to Motion to Dismiss

Defendants move to dismiss various claims in the Master Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that each fails to state a claim upon which relief may be granted.[13] This motion may be granted as to any given claim only if it is clear that Plaintiffs could not prove any set of facts consistent with the allegations in the Master Complaint that would support their claim for relief. *See Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir.2000), *cert. denied*, 531 U.S. 880, 121 S.Ct. 191, 148 L.Ed.2d 132. In ruling on the motion to dismiss, the Court must accept as true all facts asserted in the Master Complaint and draw all reasonable inferences from them in Plaintiffs' favor. *Id.* The Court must also consider facts alleged in Plaintiffs' brief in opposition to the motion to dismiss,[14] as long as they are consistent with the Master Complaint. *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439–40 (7th Cir.1994).

## III. Sufficiency of Plaintiffs' Allegations of Injury

Defendants contend that the state law claims of all but three of the named Plaintiffs should be dismissed because Plaintiffs have failed to allege that they have suffered any legally cognizable injury as a result of Defendants' actions.[15] Simply put, Defendants argue that the law provides no remedy for a defective product unless or until the defect manifests itself in some way and causes injury to person or property, and in this case Plaintiffs have alleged only that there is a risk that the alleged defects *may* cause a tread separation and/or rollover accident in the future. The Tire Class Plaintiffs counter that the injury to their tires has, in fact, manifested itself because, as a result of the defect in the Tires, "[a]s soon as *any* driving is done, the tire starts to deteriorate abnormally, developing fatigue cracks that, while imperceptible at first, grow and spread" and will eventually lead to tread separa-

---

**13.** Defendants several times make the rather obvious point that only those Plaintiffs who own(ed) or lease(d) a Ford Explorer, regardless of the type of tires that it had (or, we note, another Ford vehicle that came with the Tires as original equipment) can possibly have any type of claim against Ford, and only Plaintiffs who own(ed) or lease(d) vehicles with Firestone tires-either as original equipment or aftermarket-can possibly have any type of claim against Firestone. We do not read the Master Complaint in any way to assert the contrary.

**14.** Class Plaintiffs' Opposition to Defendants Firestone and Ford's Motion to Dismiss ("Plaintiffs' Opposition").

**15.** Three of the named Plaintiffs Gary Gustafson, William Wehking, and Allan Simpson-allege that they have experienced a tread separation incident with their Firestone tires. Defendants concede that these three Plaintiffs have asserted a legally cognizable injury, but argue that their claims are without merit for other reasons; those arguments are addressed separately below.

tion. Plaintiffs' Opposition at 54 (emphasis in original). The Explorer Diminution Class alleges that it has suffered injury in the form of the diminished resale value of their Explorers. Because the nature of injury required to maintain a cause of action differs depending upon the legal theory asserted, we will examine each cause of action in the Master Complaint to determine whether the injury pled by Plaintiffs is sufficient.

## A. Negligence

▮ In their Thirteenth Claim for Relief, entitled "Negligence," Plaintiffs assert the following:

326. [Defendants] had a duty to Plaintiffs and the Classes to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, and marketing of the Tires and Explorers.

327. [Defendants] breached their duty to Plaintiffs and the Classes by designing, manufacturing, advertising and selling the Plaintiffs and the Classes Tires that have an unreasonably dangerous propensity to experience a sudden and substantial tread separation, and Explorers that have an unreasonably dangerous propensity to roll over, and by failing to promptly recall the Tires and Explorers or take other appropriate remedial action.

328. [Defendants] should have known that the tires and Explorers were unreasonably dangerous and not as warranted and represented by [Defendants].

329. As a direct and proximate cause of [Defendants'] negligence, Plaintiffs and the Classes have suffered actual damages, and members of the Classes are threatened with

irreparable harm by undue risk of physical injuries or death.

This is a classic product liability tort claim: Plaintiffs allege that Defendants designed and sold unreasonably dangerous (that is, defective) products that have caused them injury. However, the injuries alleged by Plaintiffs are not the typical tort damages of injury to person or property resulting from malfunction of a defective product. Indeed, the Tire Class Plaintiffs' tires have not malfunctioned (or, as Plaintiffs would say, have not, malfunctioned *yet*); neither have the Explorer Diminution Class Plaintiffs' vehicles malfunctioned. Rather, Plaintiffs allege that they have been injured by their propensity to malfunction. The issue, then, is whether, under Michigan or Tennessee law, this is a sufficient assertion of injury to sustain a product liability tort claim. Our view is that it is not.

▮ The sale of a defective product, in and of itself, is not an actionable tort. An essential element of a product liability tort claim is an injury to the plaintiff's person or property:

> An actionable tort, whether based on negligence or strict liability, consists of two elements: a failure to act in accordance with the standard of care required by law and a resultant injury. While the sale of a defective product creates a potential for liability, the law grants no cause of action for inchoate wrongs. However egregious the legal fault, there is no cause of action for negligence or products liability until there is "actual loss or damage resulting to the interests of another."

*Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1136 (5th Cir.1985) (citing Prosser and Keeton on Torts, § 30 at 165 (5th ed.1984)); *see also Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.1985) ("[T]here is generally no cause of

action in tort until a plaintiff has suffered identifiable, compensable injury."). As Prosser and Keeton explain, "[t]he threat of future harm, not yet realized, is not enough. Negligent conduct is itself not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered." W. Page Keeton et al., *Prosser and Keeton on Torts* 165 (5th ed.1984). Although Plaintiffs assert that the Tires have developed fatigue cracks, they do not allege that those cracks have in any way affected the current performance of the Tires. Rather, what the Tire Class Plaintiffs really seek to recover for in this action is the possibility, or increased probability as compared to a non-defective tire, that the Tires will suffer a tread separation in the future because of the defect. Similarly, those Plaintiffs who own(ed) or lease(d) Explorers (including the Explorer subclass in the Tire Class and the Explorer Diminution Class Plaintiffs) seek to recover for the possibility that their Explorers will roll over, or for the lower resale price they might get because of that possibility. These simply are not cognizable tort injuries.

Analogous cases from throughout the country support this holding. For example, in *Weaver v. Chrysler Corp.*, 172 F.R.D. 96 (S.D.N.Y.1997), the plaintiff alleged that integrated safety seats in certain Chrysler vehicles were defective because they improperly unlatched and separated. The court found the fact that the plaintiff did not allege that the child seat in his vehicle had ever malfunctioned to be fatal to the plaintiff's tort claims. *Id.* at 100 ("Where, as here, a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies."). Similarly, in *In re Air Bag Prods. Liab. Lit.*, 7 F.Supp.2d 792 (E.D.La.1998), the plaintiffs alleged that the air bags in their automobiles were defective because they could seriously injure or kill front seat passengers when they deployed. The court determined that the plaintiffs had failed to state a tort claim because they themselves had not been injured by the air bags; in other words, they had not suffered any manifest injury as a result of the defect. *Id.* at 806 ("Thus, plaintiffs' failure to demonstrate or, even allege, manifest injury or defect shatters an essential element of all their tort and implied warranty claims."). *See also Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099–1100 (5th Cir.1991) (while deciding the case on other grounds, noting that "[w]hile we recognize that the fear of an unknowable, but potentially fatal, defect in a heart valve is perfectly rational, and almost certainly sincere, we have serious concerns about permitting recovery for such fear absent actual failure of the valve"); *Bravman v. Baxter Healthcare Corp.*, 794 F.Supp. 96 (S.D.N.Y.1992) ("New York generally does not recognize a cause of action for a faulty heart valve until the valve actually fails and causes a physical harm."), *aff'd in part and rev'd in part*, 984 F.2d 71 (2d Cir.1993); *Pfizer, Inc. v. Farsian*, 682 So.2d 405, 407 (Ala.1996) ("Alabama courts have never allowed a recovery based on a product that ... is and has been working properly.").

The cases cited by Plaintiffs do not support their contention that they have suffered an actionable tort injury. In *San Francisco Unified School Dist. v. W.R. Grace & Co.*, 37 Cal.App.4th 1318, 44 Cal. Rptr.2d 305 (1995), the plaintiff school district sued for damages resulting from the presence of asbestos-containing products in some of its school buildings. In the context of determining when the statute of limitations began to run on the plaintiff's claims, the court considered the issue of "what constitutes the element of damage

for purposes of strict liability and negligence." *Id.* at 1327, 44 Cal.Rptr.2d at 310. The court determined that the mere presence of asbestos in a building did not constitute an actionable injury for tort purposes, because "the mere presence of asbestos constitutes only a threat of future harm." *Id.* at 1330, 44 Cal.Rptr.2d at 315. Instead, tort injury occurs when asbestos contamination occurs-that is, when asbestos fibers are released into the air of the building. *Id.* at 1334, 44 Cal.Rptr.2d at 314. It is at that point that the health of the occupants of the building is threatened, and therefore it is at that point that a tort injury has occurred.

Application of this holding to the facts of the instant case makes it clear that simply owning tires or a vehicle with a defect is much like owning a building with asbestos in it. Plaintiffs are faced with the threat that the tires may suffer from a tread separation incident at any given moment, or that their vehicle will roll over in the event of an accident, in the same way the building owner is faced with the threat that the asbestos may escape into the air at any given moment. But until that occurs, no legally cognizable tort has been committed.[16]

Neither does *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829 (3d Cir. 1990), support Plaintiffs' position. In that case, the plaintiffs alleged that they were exposed to PCBs released into the environment by the defendants, and that as a result they suffered immune system damage that left them susceptible to a variety of illnesses, none of which they had yet contracted. The plaintiffs asserted that they were required to undergo medical monitoring so that if they ultimately did contract an illness as a result of their PCB exposure, it would be detected and treated as early as possible. The plaintiffs sought to recover the cost of that medical monitoring from the defendants. In determining that the "non-traditional tort" of medical monitoring did exist under Pennsylvania law, the court made clear that its holding was based upon a policy decision that plaintiffs who are exposed to toxic substances and must undergo medical surveillance as a result are entitled to a remedy. The court acknowledged the fact that traditional tort law would not provide such plaintiffs with a remedy, because they could not demonstrate the manifest injury usually required for a tort claim. Therefore, it was necessary for a new tort cause of action-one with the very narrow remedy of compensation for necessary medical monitoring-to be created in order to fill the void. Obviously, this narrow new tort is wholly inapplicable to Plaintiffs' claims in this case, and Plaintiffs' attempt to analogize their request for replacement tires to the remedy of medical monitoring is, while creative, ultimately unavailing.[17]

For the reasons set forth above, as to all Plaintiffs except Gustafson, Wehking, and

---

**16.** Plaintiffs suggest that the abnormal deterioration and fatigue cracks in the Tires are analogous to the first asbestos fiber escaping into the air. We disagree. There is no allegation by Plaintiffs that the fatigue cracks themselves affect the performance of the Tires, just as the presence of contained asbestos does not affect the safety of the air in the building. Rather, a tire's performance is not affected until it suffers a tread separation; it is this event that is analogous to the release of an asbestos fiber into the air.

**17.** Also unavailing is Plaintiffs' reliance on another medical monitoring case, *Barth v. Firestone Tire & Rubber Co.,* 661 F.Supp. 193 (N.D.Cal.1987). In that case, the court accepted as true the plaintiff's allegation that he "has suffered a direct injury to his immune system" as a result of exposure to toxic substances. Therefore, the court determined that the plaintiff had asserted a present physical injury, sufficient to support a traditional tort claim.

Simpson, Plaintiffs' Thirteenth Claim for Relief is hereby **DISMISSED,** pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted.

## B. RICO Claims

 Plaintiffs' claims asserted in their Second through Seventh Claims for Relief of the Master Complaint are based on the federal RICO Act. They allege on behalf of the Tire Class (Second Claim for Relief) and the Explorer Diminution Class (Third Claim for Relief) that defendants received income from a pattern of racketeering[18] and used or invested that income to operate and expand the enterprises defined in the Master Complaint,[19] all in violation of 18 U.S.C. § 1962(a). Master Complaint, ¶¶ 239, 266. On behalf of the Tire Class (Fourth Claim for Relief) and the Explorer Diminution Class (Fifth Claim for Relief), Plaintiffs allege that the defendants conducted and/or participated in the conduct of the affairs of the "enterprises" through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). *Id.* at ¶¶ 274, 284. In Sixth Claim for Relief (on behalf of the Tire Class) and Seventh Claim for Relief (on behalf of the Explorer Diminution Class), Plaintiffs allege that Defendants conspired, in violation of 18 U.S.C. § 1962(d), to commit the aforementioned violations of sections 1962(a) and 1962(c). *Id.* at ¶¶ 291, 295.

In order to maintain a civil action for damages under any of these theories, 18 U.S.C. § 1964 requires that a plaintiff plead and prove that he has been "injured in his business or property by reason of a violation of section 1962." Just as Defendants maintain that Plaintiffs have not pled a cognizable injury to support their negligence claims, they also argue that all of Plaintiffs' RICO claims must fail for lack of the requisite injury to business or property.

For each of the RICO claims asserted on behalf of the Tire Class, Plaintiffs allege that they have been injured because:

they have been forced to bear the financial loss associated with the cost of replacing the Tires and/or the diminished value of their vehicles equipped with the Tires now that the truth regarding their safety and lack of roadworthiness is known. Plaintiffs and the Tire Class were also injured because Defendants withheld information about safety risks concerning the Tires which, if known, would have caused consumers not to buy or lease, or to pay substantially less for, the Tires or vehicles equipped with the Tires.

Master Complaint, ¶¶ 241, 278, and 292.[20] Plaintiffs further allege that Defendants' RICO violations have injured the Explorer Diminution Class because:

they have been forced to bear the financial loss associated with the diminished value of their Explorers now that the truth regarding their safety and lack of roadworthiness is known. Plaintiffs and the Explorer Diminution Class were also injured because defendants withheld information about the safety risks con-

---

**18.** Briefly stated, the "pattern of racketeering" described in the Master Complaint refers to Defendants' acts in furtherance of their alleged fraudulent scheme "to deceive the automotive buying and leasing public regarding the features, safety, quality, and value" of the Tires and Explorers. *Id.*

**19.** The Master Complaint defines three enterprises: Ford and Firestone as an association-in-fact enterprise (the "Domestic Enterprise") (*id.* at ¶ 211), and Ford, Firestone, and Bridgestone as an association-in-fact enterprise (the "International Enterprise") (*id.* at ¶ 214), and the Bridgestone Firestone Enterprise (*id.* at ¶ 247).

**20.** Plaintiffs have employed slight, immaterial wording differences among the cited paragraphs.

cerning the Explorer which, if known, would have caused consumers not to purchase or lease, or to pay substantially less for, Explorers.

*Id.* at ¶¶ 268, 288, and 296.[21]

The Master Complaint does not allege that those Plaintiffs who have replaced their tires did so as a result of their tires failing, nor does it allege that Plaintiffs suffered any pecuniary loss as the result of actual tire failure.[22] The Master Complaint also does not allege that any plaintiff has incurred an actual monetary loss as the result of the alleged diminished value of the Tires or Explorers by selling or attempting to sell them.

The nature of Plaintiffs' alleged RICO injuries are thus of two general but interdependent types. First, they claim that the Tires (or vehicles equipped with them) and Explorers are not worth what they paid for them or that they would not have bought them at all. In other words, their injury is the diminished value of their property. Second, Plaintiffs claim to have been injured because they have expended money—either in purchasing the Tires and/or Explorers or in replacing allegedly defective tires. We hold that these allegations do not satisfy the injury to business or property requirement of 18 U.S.C. § 1964.

■■■ Federal courts have consistently and repeatedly held that to satisfy the injury requirement of section 1964, a plaintiff must prove an actual, concrete monetary loss (*i.e.,* an "out-of-pocket" loss). *See, e.g., In re Taxable Municipal Bond Securities Litigation,* 51 F.3d 518, 523 (5th Cir.1995) (RICO claim dismissed for failure to show conclusive financial loss); *Steele v. Hospital Corp. of America,* 36 F.3d 69, 70–71 (9th Cir.1994) (patients who had not paid out money as a result of alleged scheme that reduced their insurance benefits could not show required concrete financial loss); *Dornberger v. Metropolitan Life Ins.,* 961 F.Supp. 506, 521–22 (S.D.N.Y.1997) (RICO injury requires showing of actual, out-of pocket financial loss). An injury that is speculative or contingent on future events that may or may not occur is insufficient to satisfy the injury requirement. *See, e.g., Imagineering v. Knighten Bros. Construction,* 976 F.2d 1303, 1310–11 (9th Cir.1992) (RICO claim dismissed because alleged injury required speculation that other events would have occurred); *Lincoln House v. Dupre,* 903 F.2d 845, 847 (1st Cir.1990) (allegation of RICO injury that is contingent on outcome of separate litigation is purely speculative and not ripe for resolution); *Hecht v. Commerce Clearing House,* 897 F.2d 21, 24 (2d Cir.1990) (plaintiff's allegation that RICO violation would cause him to lose commissions in future too speculative to satisfy injury requirement); *Arabian American Oil. Co. v. Scarfone,* 713 F.Supp. 1420, 1421 (M.D.Fl.1989) (speculation that injury might be inflicted is insufficient to state RICO claim); *Anitora Travel v. Lapian,* 677 F.Supp. 209, 216 (S.D.N.Y.1988) (no RICO injury absent allegation of actual, present injury, rather than speculative injury that may only possibly occur in the future).

Guided by these principles, we turn to an examination of Plaintiffs' specific allega-

---

**21.** *See supra* note 20.

**22.** The Court notes that a few individual plaintiffs have alleged that they incurred replacement costs following tread separation or tire "failures." Both the Master Complaint and Plaintiffs' brief make clear, however, that Plaintiffs have not based their claim of RICO injury on replacement following tire failure, nor have they requested relief on behalf of a class so defined. This portion of the Court's Order therefore does not apply to these individuals to the extent they may later choose to assert individual RICO claims based on replacement costs incurred.

tions of the injury caused by Defendants' RICO violations. As noted above, Plaintiffs allege, both on behalf of the Tire Class and the Explorer Diminution Class, that Defendants' fraudulent conduct induced them to purchase tires and/or vehicles that, because of their inherent defects, are of diminished value. They maintain that they have suffered an injury for which RICO provides a remedy because they "paid inflated prices to buy or lease products the market has now devalued because their previously concealed design defects render them unsafe." Plaintiffs' Opposition at 43.[23] According to Plaintiffs, these diminished values, along with the "out-of-pocket costs Plaintiffs are paying to replace inherently defective tires," demonstrate that Plaintiffs "have already sustained real pecuniary losses." *Id.*

Despite their description of injury in the past tense, Plaintiffs' assertion of financial loss is grounded in the possibility of future events that may cause them to suffer the loss associated with the products they claim are defective or diminished in value: the tires that they have unilaterally replaced or may replace in the future may suffer tread separation; they may receive on trade-in or resale of their Explorers (or other vehicles equipped with the Tires) less than they would have received absent the alleged defects. As numerous appellate and district courts have held, however, RICO affords a monetary remedy only to plaintiffs who have actually realized the diminished value or experienced product failure, and not to those who allege a risk (or even a probability) of such loss.

In *Maio v. Aetna*, 221 F.3d 472 (3d Cir.2000), the Third Circuit recently addressed a similar claim. The plaintiffs were insured members of an HMO plan provided by Aetna. They asserted RICO claims based primarily on the defendants' alleged fraudulent advertising about the quality and features of the HMO plan, maintaining that they were injured because the defendants actually maintained procedures and practices inconsistent with their advertising campaign. Specifically, the plaintiffs alleged that the defendants' RICO violations caused them to pay "more for their HMO plans than those plans were worth." *Id.* at 480.

Relying on numerous RICO decisions requiring tangible financial loss, the Third Circuit rejected the plaintiffs' "overpayment" theory of RICO injury. The court held that:

> appellants cannot establish that they suffered a tangible economic harm compensable under RICO unless they allege that health care they received under Aetna's plan actually was compromised or diminished as a result of Aetna's management decisions challenged in the complaint.... There is no factual basis for appellants' conclusory allegation that they have been injured in their "property" because the health insurance they actually received was inferior and therefore "worth less" than what they paid for it.[24]

*Id.* at 488.[25] The Third Circuit's discussion of the plaintiffs' diminution in value

---

**23.** Plaintiffs suggest that the diminished value is reflected in standard market guides such as the *Kelly Blue Book. Id.* at 45.

**24.** The court went on to explain that the requisite actual losses would have to be alleged and proven on an individual basis. *Id.* at 488.

**25.** Plaintiffs make much of the fact that the Third Circuit distinguished the "health care product" at issue, which it characterized as a contractual right to receive medical benefits, from property of a tangible nature. *See id.* at 488–89. That distinction was, in fact, only one of three independent grounds for the court's holding. The other two grounds, discussed below, are fully applicable here.

theory is particularly instructive in this case:

> [W]e also reject appellants' theory of RICO injury resting on the purported diminution in product value because, . . . as a matter of simple logic, they obviously cannot show that they actually received something "inferior" and "worth less" absent individualized allegations concerning the quantity and quality of health care benefits Aetna provided under its HMO plan. Put differently, assuming *arguendo* that the injury claimed is predicated solely on the alleged financial loss of premium dollars stemming from appellants' purchase of an "inferior health care product," the harm alleged, *i.e.*, overpayment, cannot exist absent proof of some level of inferior treatment under Aetna's HMO plan.
>
> \* \* \* \* \* \*
>
> Rather, the occurrence of an injury-causing event such as, for example, a denial of adequate care or a delay in treatment is viewed more appropriately as the contingency upon which appellants' economic damages are dependent. In other words, allegations of the foregoing nature are necessary to provide the factual basis for appellants' otherwise conclusory allegation that they have been injured in their "property" because they overpaid for Aetna's inferior health care product.

*Id.* at 492–94.

Like the HMO enrollees in *Maio* who alleged they had overpaid for an inferior product, Plaintiffs here have not suffered cognizable RICO injury by virtue of their purchases of the Tires or Explorers, absent particularized allegations of the inferior performance of those products. The actual failure of the Tires or Explorers, like the failure of the HMO plans to provide the quality care advertised, is a contingency upon which Plaintiffs' economic damages are dependent.

The *Maio* court also found the plaintiffs' theory of RICO injury untenable because it was predicated on the conclusion that the economic value of the product purchased was reduced because of the *possibility* that the alleged inferiority of the product would manifest itself at some point in the future, just as Plaintiffs here allege that the possibility of tire or vehicle failure reduces their property's value or necessitates replacement. The court rejected the notion that present economic harm has been alleged when it "necessarily is contingent upon the impact of events in the future which have not yet occurred." *Id.* at 494–95. That theory, the court held, requires impermissible factual speculation about events that may not occur and would "expand[ ] the concept of RICO injury beyond the boundaries of reason." *Id.* at 496.

Similarly, in *First Nationwide Bank v. Gelt Funding*, 27 F.3d 763 (2d Cir.1994), the Second Circuit upheld the dismissal of RICO claims because the plaintiff had not yet incurred an actual injury. The plaintiff bank claimed that the defendants had fraudulently induced it to make non-recourse loans by misrepresenting the value of the properties pledged as collateral. The bank was injured, it alleged, because

---

We note here also that one federal district court has recently refused to draw the distinction made by the *Maio* court to which Plaintiffs refer. In *In re Managed Care Litigation*, 150 F.Supp.2d 1330 (S.D.Fla.2001), the court found that the dichotomy drawn in *Maio* between tangible property interests and health care contracts that have not been breached was inappropriate because the insureds' claims were more like fraudulent inducement claims than claims for breach of contract. *Id.* at 1337–39. The court did not expressly address the other bases for the *Maio* court's ruling and it declined to address at that juncture whether the evidence would support the plaintiffs' allegation of injury. *Id.* at 1339–40.

it had lent more funds than it would have had it known the true value of the collateral and was thus undersecured for the excess amounts. The bank also alleged injury as a result of having to increase its reserves to cover the potential risk of the borrowers' default. The bank did not allege, however, that the fraudulently induced loans were in default or that it had had to foreclose on the insufficient collateral. *Id.* at 766–67.

The Second Circuit noted that, under the bank's theory, it would have been injured even if the loans were ultimately repaid in full with interest, *id.* at 767–68, just as Plaintiffs in this case would recover under their theory even if their tires and/or Explorers perform without failure throughout their normal useful life and even if they never actually lose money by selling them. Nevertheless, the *Gelt* plaintiff argued that it suffered an "immediate quantifiable injury when the loans were made because ... [it] assumed additional risk of loss, and '[f]or all practical purposes the[ ] additional funds were lost the moment the loans were made.'" *Id.* at 768. That argument, nearly identical to the argument of Plaintiffs here that they sustained a monetary injury as soon as they

purchased the Tires and/or Explorers, or "as soon as the rubber hit the road," did not persuade the Second Circuit:

> [W]e reject FNB's novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined.[26]

*Id.*

The failure to allege the plaintiff's actual realization of her property's diminished value led to dismissal of the RICO claims asserted in *Oscar v. University Students Co–operative Ass'n,* 965 F.2d 783 (9th Cir. 1992) (*en banc*). The plaintiff, a tenant in an apartment building, brought a RICO action against the owner and tenants of a neighboring apartment building. She claimed that the illegal conduct of her neighbors had decreased the value of her property. The Ninth Circuit upheld the district court's dismissal of her RICO claim because she did not allege that she had ever sublet or tried to sublet her apartment, or "even that she ever wished or intended to sublet the apartment." Her alleged loss was, according to the Ninth Circuit, "therefore purely speculative." *Id.* at 787.[27] *See also Pelfresne v. Village of Rosemont,* 22 F.Supp.2d 756, 765

---

**26.** The holding in *Gelt* illustrates the distinction between an unrealized (even if theoretically demonstrable) diminution in value from the type of actual, concrete injury required by 18 U.S.C. § 1964. We are aware, just as the Second Circuit was undoubtedly aware, that the secondary market for commercial paper might have placed a value on the subject loans determined in part by the actual value of the collateral and that it might have been possible to quantify the diminution in value attributable to the inadequacy of the collateral. Similarly here, Plaintiffs maintain that they can show diminution in a generalized manner by reference to standard market guides, and we accept that assertion for purposes of this motion. However, diminished value as a commercial concept is plainly not a RICO injury unless and until a plaintiff actually realizes a loss occasioned by it. The wisdom of that requirement was recognized

by the Second Circuit. The lender in *Gelt* may, for example, have held onto the loans, betting against default and foreclosure, and hence, not have suffered a concrete monetary loss at all, just as a Tire or Explorer owner may bet against failure and never realize an actual loss. (Whether it is prudent for an owner to take what Plaintiffs would assert is a significant risk is not the issue, and Plaintiffs wisely do not argue that increased risk constitutes a RICO injury. *See, e.g., Dornberger,* 961 F.Supp. at 522 (increased risk not a RICO injury)(citing several authorities)).

**27.** The court also based its holding on its unwillingness to treat the plaintiff's property interest as a renter the same as that of an owner of real property, finding her injury to be more in the nature of personal discomfort or annoyance, which is not compensable under RICO. *See id.* at 786–87.

(N.D.Ill.1998) (allegation that plaintiff would lose the fair market value of his property in the future insufficient to support RICO claim).

Substantial support for our conclusion that Plaintiffs' diminished value theory does not satisfy the requirements of section 1964 can also be found in a recent unpublished decision of the District of Columbia district court. In *Tri–State Express v. Cummins Engine*, Civ. A. 99–00220(HHK) (D.D.C. September 11, 2000), the court dismissed the RICO claims of truck owners who alleged that they had been injured because the defendants' conduct had "reduced the present economic value" of their trucks and engines. *Id.*, slip op. at 6. Relying, as we have, on *Maio*, *Gelt*, and *Steele*, the court held that the plaintiffs had not alleged any realized, concrete injury as a result of the alleged defects, "but only the potential for harm," and that the speculative or future injuries suggested by the plaintiffs were "insufficient to activate RICO's remedial scheme." *Id.*, slip op. at 13–14.[28]

■ The principle that emerges from all of the decisions discussed above is that a plaintiff alleges a cognizable injury (one that is concrete, tangible, and not speculative or contingent) as a result of a purchase only where the diminished value of the plaintiff's property has actually been realized or when the alleged infirmity in the purchased property has otherwise tangibly manifested itself. For this reason, Plaintiffs' allegations that they paid more for the Tires and Explorers than they are worth, or that they have incurred or will incur the cost of replacing Tires that have never manifested the alleged defect, are insufficient to sustain their RICO claims.[29]

None of the RICO decisions cited by Plaintiffs counsels a different conclusion.[30]

28. Plaintiffs' attempt to distinguish this holding (*see* Plaintiffs' Opposition at 52–53) is unavailing. Nothing in that court's analysis suggests that it based its conclusion regarding the lack of RICO injury on the existence of a consent decree, the likelihood of fines, or the assertion that only the environment, and not the plaintiffs, suffered injury related to the higher emission levels at issue.

29. We take judicial notice of the fact that in late May of this year, Ford announced that it would replace many, if not most, of the tires that are the subject of the Master Complaint and would reimburse certain owners who had already replaced tires at their own expense. The diminution in value and replacement costs alleged as injury to the Tire Class may, therefore, never be realized for this reason alone. Although we in no way base our holding on this fact because it is outside the pleadings (nor do we suggest that these costs or associated costs alleged in the Master Complaint cannot be recoverable under any theory), it does illustrate a purpose of RICO's requirement that the injury alleged be concrete and not speculative or contingent.

30. Some of them do not even address the injury issue, likely because the allegation of present injury was plainly sufficient. In *Emery v. American General Finance*, 71 F.3d 1343 (7th Cir.1995), for example, the plaintiff alleged that she had paid and was continuing to pay more for credit than she would have paid had the defendant not engaged in fraudulent "loan flipping." As the Seventh Circuit noted, the plaintiff had paid $1200 to borrow $200, or roughly three times what she would have paid absent the alleged fraudulent conduct. *Id.* at 1345–46. Unlike this case, no speculation was necessary to make this calculation, and her out-of-pocket loss awaited the occurrence of no contingency. *SK Hand Tool v. Dresser Industries*, 852 F.2d 936 (7th Cir. 1988), also does not specifically address the injury requirement. Rather, the court dismissed the RICO claims for failure to allege the required pattern of racketeering activity. *Id.* at 940–43. In any event, the allegation of injury in *SK Hand Tool* was of a present, non-contingent loss premised on the plaintiff's purchase of a business as to which the defendants had concealed liabilities and misrepresented the inventory. *Id.* at 938. On the day the plaintiff purchased the business, therefore, it received more liabilities and less inventory than it had paid for. The buyer's loss was immediate because it did not depend on

The court in *Kaushal v. State Bank of India*, 1988 WL 116542, 1988 U.S. Dist. LEXIS 11988 (N.D.Ill.1988), addressed the RICO injury requirement in the context of a purchase of a business. The plaintiffs alleged that they were induced by fraud to purchase a company that had concealed debt-non-contingent liability—that had produced an immediate, quantifiable loss. *Id.* at 1988 WL 116542, *3, 1988 U.S. Dist. LEXIS 11988, *8. *See also Grove Holding v. First Wisconsin Nat'l Bank*, 803 F.Supp. 1486, 1509 (E.D.Wis.1992) (RICO injury where plaintiffs had purchased company, the assets and liabilities of which had been misrepresented). In the remaining decisions cited by Plaintiffs, the courts found the injury requirement to have been met because the monetary loss had already been incurred or the infirmity in the product purchased had already manifested itself. *See Lentz v. Pan American*, 1991 WL 240739, 1991 U.S. Dist. LEXIS 16445 (E.D.Pa.1991) (plaintiff purchased security services he did not receive); *In re Synthroid Marketing Litigation*, 188 F.R.D. 295 (N.D.Ill.1999) (loss occurred upon purchase; not dependent on any future event); *In re Merrill Lynch Limited Partnerships Litigation*, 7 F.Supp.2d 256 (S.D.N.Y.1997) (plaintiffs' injuries not speculative because allegation was that limited partnerships purchased could, at point of their purchase, never achieve their promised objectives). The allegations of RICO injury in this case are very different from the allegations made in the cases Plaintiffs rely upon. Whether Plaintiffs received what they allege they paid for (tires and vehicles that perform as warranted) is contingent on future events that may or may not occur.

One decision cited by Plaintiffs, *In re Cordis*, 1992 WL 754061 (S.D.Ohio 1992), does appear to lend support to Plaintiffs' position that they can recover under RICO for diminished value and replacement costs. In that case, the district court found that the plaintiffs who alleged they had purchased faulty pacemakers had adequately alleged an injury under section 1964 for "the diminished value of the product and the costs associated with implanting and explanting the product." *Id.* at *3. In reaching this conclusion, the court drew analogies to recoveries by purchasers in the antitrust and securities fraud contexts and found no basis for "a principled distinction" between those purchasers and the purchasers of the allegedly defective pacemakers. *Id. Cordis* is distinguishable from this case on two grounds. First, it is not entirely clear that the *Cordis* court assumed that any contingency was involved, *i.e.*, whether the plaintiffs' pacemakers would ultimately be removed and replaced. Second, the court dismissed the plaintiffs' RICO claims for failure to allege an enterprise, so its discussion of injury was not necessary to its judgment.

Notwithstanding these distinctions, one could plausibly conclude that the result we reach here cannot fairly be harmonized with the analysis employed in *Cordis*. If that is so, we decline to follow *Cordis*. First, as noted above, the weight of authority on the issue presented is decidedly contrary to the analysis of *Cordis*. Moreover, because *Cordis* was decided in 1992, the court did not have the benefit of this weight of authority, including the Third Circuit's decision in *Maio*, the Second Circuit's decision in *Gelt*, and the Ninth Cir-

any future contingency. In *Line v. Astro Manufacturing*, 993 F.Supp. 1033 (E.D.Ky.1998), the court also did not reach the issue presented here. The court merely held that the plaintiffs had not alleged a RICO injury because the houses they had purchased were not worth less than what the plaintiffs had paid for them. The court therefore had no reason to (and did not) opine on the point at which non-existent damages might have accrued. *See id.* at 1037.

cuit's decisions in *Oscar* and *Steele*. Second, we *do* see the basis for a principled distinction between the losses alleged by Plaintiffs here and the purchase loss of a plaintiff in the antitrust or securities fraud context. Although the *nature* of the injury to business or property required by the RICO Act does not differ appreciably from the nature of the injury required to sustain an antitrust or securities fraud claim, the *accrual* of the injury may differ based on the facts alleged and the legal theory employed.[31]

For all the reasons stated above, we hold that Plaintiffs have not alleged an injury cognizable under 18 U.S.C. § 1964. The Second through Seventh Claims for Relief of the Master Complaint are thus hereby *DISMISSED*.

C. Claims under Consumer Protection Statutes

■ In their Tenth Claim for Relief, entitled "Violation of All States' Consumer Protection Statutes," Plaintiffs allege the following:

308. [Defendants] engaged in unfair competition or unfair or deceptive acts or practices in violation of any and all state consumer protection statutes when they represented, through their advertising, warranties, and other express representations, that the Tires and Explorers had benefits or characteristics that they did not

actually have. [Defendants] further violated state consumer protection statutes when they falsely represented that the Tires and Explorers were of a particular standard or quality when they were not. Finally, [Defendants] violated state consumer protection statutes when they advertised the Tires and Explorers with the intent not to sell them as advertised, and when, in so doing, they concealed and suppressed facts material to the true characteristics, standards, and quality of these products.

309. [Defendants'] deceptive practices were specifically designed to induce Plaintiffs and the Classes to buy the Tires and Explorers.

310. To this day, [Defendants] continue to engage in unlawful practices in violation of state consumer protection statutes.

311. As a direct and proximate result of [Defendants'] unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Classes have suffered actual damages and members of the Classes are threatened with irreparable harm by undue risk of physical injuries or death.

In short, Plaintiffs allege the basic components of a consumer protection claim-un-

---

**31.** An antitrust plaintiff who purchases a good at a price inflated by virtue of the defendant's anticompetitive conduct generally is injured at the point of purchase. If, for example, she has paid three dollars for a good that, but for the antitrust violation, would have cost two dollars, she has been injured at the moment of purchase and no future contingency (such as the sale or replacement of the good or the failure of the good) must occur before she actually has sustained an out-of-pocket loss. Similarly, a plaintiff who has purchased a security in reliance on material misrepresentations sustains a present loss not contingent on any future event. As the cases in the preceding discussion involving the purchase of a business illustrate, the purchaser of a company (including a purchaser of securities) immediately incurs a loss when the company's assets and liabilities have been misrepresented, because what the purchaser has or has not received is not dependent on any future event.

fair or deceptive acts or practices, committed in the pursuit of trade or commerce, which result in loss.

As in their arguments for dismissing the negligence and RICO claims, Defendants contend that all Plaintiffs except those who have suffered a tread separation fail to state a claim because they do not plead injury. Reply Brief III at 13–14. Defendants' argument, though successful to defeat Plaintiffs' negligence and RICO claims, is unconvincing in the realm of consumer protection claims. Rather than injury, as required for RICO or negligence claims, to state a consumer protection cause of action, Plaintiffs need plead only "loss." The TCPA provides that "[a]ny person who suffers an *ascertainable loss* of money or property ... as a result ... of an unfair or deceptive act or practice ... may bring an action individually to recover actual damages." Tenn.Code Ann. § 47–18–109(a)(1) (emphasis added). The MCPA similarly sets forth a claim for the greater of actual damages or $250.00 for "[a] person who suffers *loss* as a result of a violation of this act." Mich. Comp. Laws § 445.911(b)(2) (emphasis added).[32]

Defendants argue that Plaintiffs cannot recover under the relevant consumer protection statutes because they "have not alleged that they experienced any manifestation of the alleged defect or injury." Brief III at 3. Courts interpreting the terms "ascertainable loss" and "loss" in consumer protection statutes disagree. For instance, in *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 440 A.2d 810, 813–14 (1981), the Supreme Court of Connecticut interpreted the term "ascertainable loss" in the Connecticut Unfair Trade Practices Act ("CUTPA"), ruling that a consumer who had bought a vehicle advertised as "full-time four-wheel drive" but was actually equipped with a "limited slip differential mechanism" suffered a loss under CUTPA. In so ruling, the Court reasoned that "[w]henever a consumer has received something other than what he bargained for, he has suffered a loss of money or property." *Id.* at 814. Here, Plaintiffs allege, among other claims, that they expected to receive Tires and Explorers "of a particular standard or quality" but actually received Tires and Explorers of a lower standard or quality. Master Complaint, ¶ 308. Such an allegation is a classic example of "receiv[ing] something other than what [they] bargained for." *See Hinchliffe*, 440 A.2d at 814. Furthermore, unlike with RICO claims, this alleged diminution in value satisfies the loss requirement. *Compare Maio*, 221 F.3d at 492 ("[W]e also reject appellants' theory of RICO injury resting on the purported diminution in value because, ... as a matter of simple logic, they obviously cannot show that they actually received something 'inferior' and 'worth less' absent individualized allegations concerning the quantity and quality of health care benefits Aetna provided under its HMO plan.") *with Hinchliffe*, 440 A.2d at 814 ("[O]bviously such diminution [in value] would satisfy the statute.").

The Court views as convincing this interpretation of the New Jersey and Connecticut consumer protection statutes and concludes that the interpretation is equally applicable to the TCPA and the MCPA. In fact, a claim quite similar to Plaintiffs' claim has been specifically rec-

---

**32.** While the MCPA refers to "loss," Mich. Comp. Laws § 445.911(b)(2), and the TCPA refers to "ascertainable loss," Tenn.Code Ann. § 47–18–109(a)(1), the Court sees no reason to interpret the two terms differently in determining whether Plaintiffs have stated a claim under the relevant state consumer protection statutes. *See Miller v. American Family Publishers*, 284 N.J.Super. 67, 663 A.2d 643, 655 n. 10 (1995) (finding no significant difference between "loss" and "ascertainable loss").

ognized by the Court of Appeals of Michigan. In *Mayhall v. A.H. Pond Co., Inc.*, 129 Mich.App. 178, 341 N.W.2d 268, 271–72 (1983), the court ruled that the plaintiff stated a "loss" under the MCPA when he alleged that the diamond ring he purchased was advertised as "guaranteed perfect" but actually was flawed. The Michigan court reasoned that "the injury suffered by a victim of fraud [is failure to] receive what he expected to receive." *Id.* at 271. Loss, under a consumer protection claim, can arise from the "frustration of [the plaintiff's] expectations," as created by the defendant. *Id.* This aspect of consumer protection claims also distinguishes them from RICO claims. Because the loss in a consumer protection claim can arise solely from receiving something *different from*, rather than *less than*, what was represented to the plaintiff, the contingency of the alleged loss is not a barrier to stating a claim here as it is in the RICO context. *See also Hinchliffe*, 440 A.2d at 814 ("To the consumer who wishes to purchase an energy saving compact, for example, it is no answer to say that he should be more satisfied with a more valuable gas guzzler.").

Finally, it is of no consequence that most Plaintiffs have not alleged that they tried to sell, trade in, or replace their Tires or Explorers. The court in *Mayhall*, 341 N.W.2d at 270, addressed whether an injury to the plaintiff's pocketbook was necessary to state a claim and found that it was not required. Plaintiffs need not allege that they ever tried to sell or trade in their tires or vehicles or that they experienced tread separation in order to state a loss.

Because the TCPA and the MCPA require only that Plaintiffs allege a loss, and Plaintiffs have do so, Plaintiffs' claim for violation of state consumer protection statutes will not be dismissed for failure to allege manifest injury.

### D. Claims for Breach of Implied Warranty

■ In their Twelfth Claim for Relief, entitled Breach of Implied Warranty, Plaintiffs allege the following:

320. [Defendants] impliedly warrant that the Tires and Explorers, which they designed, manufactured and sold to Plaintiffs and the Classes, pass without objection in the trade, are fit and merchantable for their ordinary use, are not otherwise injurious to consumers, and are adequately contained, packaged and labeled.

321. Because of the undisclosed unreasonably dangerous propensity of the Tires to experience a sudden and substantial tread separation, the Tires cannot pass without objection in the trade, are unsafe, unmerchantable, and unfit for their ordinary use when sold, are not adequately contained, packaged and labeled, and threaten injury to Plaintiffs and members of the Classes.

322. Because of the undisclosed unreasonably dangerous propensity of the Explorers to roll over, the Explorers cannot pass without objection in the trade, are unsafe, unmerchantable, and unfit for their ordinary use when sold, are not adequately contained, packaged and labeled, and threaten injury to Plaintiffs and members of the Classes.

323. As a direct and proximate result of [Defendants'] breach of implied warranty, Plaintiffs and the Classes have suffered actual damages and members of the Classes are threatened with irreparable harm by undue risk of physical injuries and death.

In other words, Plaintiffs allege that each Defendant has breached the implied warranty of merchantability by selling, respectively, defective Tires and Explorers.

Both Michigan and Tennessee have adopted Uniform Commercial Code § 2–314, the section that establishes an implied warranty of merchantability in the sales of goods by merchants. *See* Mich. Comp. Laws § 440.2314; Tenn.Code Ann. § 47–2–314.[33] Defendants argue that Plaintiffs may not maintain an action for breach of the implied warranty of merchantability for the same reason that their negligence and RICO claims fail: they do not allege that they have suffered any manifest injury. However, U.C.C. § 2–725(2), which also has been adopted by both Tennessee and Michigan, expressly provides otherwise:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except

that where a warranty explicitly extends to future performance of the goods [34] and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Mich.Comp.Laws § 440.2725(2); Tenn. Code Ann. § 47–2–725(2). "Accrue" is defined as "to come into existence as a claim that is legally enforceable." *American Heritage Dictionary* (3d Ed.1992); *see also Black's Law Dictionary* (5th Ed.1979) ("A cause of action 'accrues' when a suit may be maintained thereon."). Therefore, by the plain language of the statute, each Plaintiff's cause of action for breach of implied warranty accrued at the time he or she purchased an Explorer (as to Ford) or one or more of the Tires (or a vehicle equipped with the Tires) (as to Firestone), and there is no requirement that Plaintiffs demonstrate any injury to their person or property as a result of the breach, but only that they purchased an unmerchantable product.[35]

We are cognizant of the fact that numerous courts have suggested otherwise.[36]

**33.** Both states also have adopted the correlating section relating to leases, U.C.C. § 2A–212. *See* Mich. Comp. Laws § 440.2862; Tenn.Code Ann. § 47–2A–212.

**34.** This exception does not apply to implied warranties. *See* Hawkland, Uniform Commercial Code Series § 2–725:02 (1994 ed.) ("By definition, an implied warranty is not explicit, and, therefore, the exception has no application to implied warranties. Stated differently, the statute of limitations will always start to run against claims based on implied warranty from the time when delivery of the goods is tendered."); *accord Antz v. GAF Materials Corp.*, 719 A.2d 758, 760 (1998); *Washington Freightliner, Inc. v. Shantytown Pier, Inc.*, 351 Md. 616, 719 A.2d 541, 545 (1998); *Cosman v. Ford Motor Co.*, 285 Ill.App.3d 250, 220 Ill.Dec. 790, 674 N.E.2d 61, 66 (1996); *Champion Home Builders, Inc. v. Hodge*, 602 So.2d 399, 400 (Ala.1992); *Huff v. Hobgood*, 549 So.2d 951, 954 (Miss.1989); *American Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173, 176 (Tex.App.1989); *Armour v. Alaska Power Auth.*, 765 P.2d 1372, 1375 (Alaska

1988); *Dickerson v. Mountain View Equip. Co.*, 109 Idaho 711, 710 P.2d 621, 625 (1985); *Voth v. Chrysler Motor Corp.*, 218 Kan. 644, 545 P.2d 371, 378 (1976).

**35.** The Court does not in this discussion consider whether Plaintiffs can satisfy the other elements required for recovery on a breach of implied warranty claim, only whether they are required to plead manifest injury. Defendants' arguments regarding the other necessary elements are discussed below.

**36.** The Court also recognizes the Michigan Supreme Court's statement that "under the common law of products liability, in an action against the manufacturer of a product based upon an alleged defect in its design, 'breach of implied warranty and negligence involve identical evidence and require proof of exactly the same elements.'" *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 365 N.W.2d 176, 186 (1984) (citation omitted). However, neither that case nor any other Michigan case that we have found dealt with the question of whether

*See, e.g., Briehl v. General Motors Corp.,* 172 F.3d 623, 628 (8th Cir.1999) (holding, without distinguishing between tort and warranty claims, that "[s]ince the Plaintiffs have failed to allege any manifest defect and their vehicles perform in a satisfactory manner," the complaint must be dismissed); *Jarman v. United Indus. Corp.,* 98 F.Supp.2d 757, 768 (S.D.Miss. 2000) (no warranty claim "unless there is actually a failure in product performance"; "[m]ere suspicion of a lost bargain ... will not support an award of damages"); *In re Air Bag Prods. Liab. Lit.,* 7 F.Supp.2d at 805 (citation omitted) (in either tort or breach of implied warranty of merchantability claim, there is no cause of action "until there is actual loss or damage"); *Yost v. General Motors Corp.,* 651 F.Supp. 656 (D.N.J.1986) (damage is a necessary element of breach of warranty claim); *Feinstein v. Firestone Tire & Rubber Co.,* 535 F.Supp. 595, 602–03 (S.D.N.Y.1982) (as to implied warranty claim, rejecting argument that "the purchase of a defective tire, ipso facto, caused economic loss" because tires in question "lived full, productive lives"); *Weaver,* 172 F.R.D. at 96 (finding damages an essential element of breach of warranty, so that plaintiff who alleged defect in child seat but who had not experienced any problem with his child seat had no cause of action); *Bravman,* 794 F.Supp. at 99 (citation omitted) (finding that "consumer claims sounding in tort or breach of implied warranty are substantively the same, requiring the same elements of proof," and both require injury); *but see Rivera v. Wyeth–Ayerst Labs.,* 121 F.Supp.2d 614 (S.D.Tex.2000) (plaintiffs who took drug that was withdrawn from the market due to risk of liver damage had properly asserted breach of implied warranty of merchantability claim for purchase price of drug even though they themselves had suffered no liver damage or other health problems); *Microsoft Corp. v. Manning,* 914 S.W.2d 602 (Tex. App.1995) (buyer of defective software program has warranty action even if he never suffers data loss as a result of the defect because buyer did not get what he bargained for). While couched in terms of whether manifest injury must be pled, the real ground for dismissing most of the cases cited above that are contrary to our conclusion on this point was that the defective products that the plaintiffs had purchased performed satisfactorily throughout their useful life, and therefore the plaintiffs had reaped the benefit of their bargain. That is simply another way of saying that the products were, in fact, merchantable, and therefore there was no breach of warranty. However, if Plaintiffs in this case ultimately can demonstrate that their Tires or Explorers were not merchantable at the time of purchase, they will not be required also to demonstrate that the Tires or Explorers have malfunctioned in order to maintain a breach of implied warranty claim.

As explained above, to recover under their warranty claims, Plaintiffs need only allege and prove that the Tires or Explorers are *defective.* They are not required to allege and prove the same manifestation of defect necessary to sustain negligence and RICO claims. Defendants' argument assumes that the only way Plaintiffs can prove that Tires are defective is by tread separation and that they only way Plaintiffs can prove that the Explorers are defective is by an active roll-over incident. However, this is a factual assumption that is inappropriate for the Court to embrace in ruling on a motion to dismiss. Plaintiffs

---

injury is required to maintain a breach of implied warranty action. Rather, the Michigan Supreme Court's language can best be read as applying to those cases involving personal injury or property damage; in other words, cases involving injury from a defective product, whether under a tort or implied warranty theory, involve the same elements.

allege that the Tires and the Explorers are defective, and as Defendants cannot demonstrate as a matter of law that they are not, we shall assume for purposes of this motion that they are. Therefore, Plaintiffs' claim for breach of implied warranty of merchantability will not be dismissed for failure to allege manifest injury.[37]

### E. Claims for Breach of Express Warranty

■ In their Eleventh Claim for Relief, entitled Breach of Express Warranty, Plaintiffs allege that Defendants "expressly warrant the Tires and Explorers to be free of defects at the time of delivery, which warranties are express warranties within the meaning of section 2–313 of the Uniform Commercial Code" and that Defendants "breached their express warranties by offering for sale, and selling as safe, Tires and Explorers that are, by design, defective in that they are unreasonably dangerous and likely to cause serious injury or death." Master Complaint, ¶¶ 314–15. Plaintiffs further allege that as a proximate result of Defendants' breach of the express warranty, Plaintiffs have "suffered actual damages and ... are threatened with irreparable harm by undue risk of physical injuries or death." *Id.* at ¶ 316. Inasmuch as U.C.C. § 2–725(2) applies to express warranty claims as well as implied warranty claims, and Plaintiffs expressly plead that the express warranty applied to the Tires and Explorers "at the time of delivery," the same analysis applies to both claims. Accordingly, Plaintiffs' express warranty claims are not subject to dismissal for failure to plead manifest injury.[38]

### F. Magnuson–Moss Warranty Act Claims

■ In their First Claim for Relief, entitled Magnuson Moss Warranty Act, Plaintiffs assert a claim under the Magnuson Moss Warranty Act, 15 U.S.C. § 2310(d)(1) ("the Act"), which provides, in relevant part:

> Subject to subsections (a)(3) and (e) of this section, a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief.

Plaintiffs' claim under the Act is based solely on Defendants' alleged breach of express and implied warranties as set forth in their Eleventh and Twelfth Claims for Relief. Plaintiffs assert that "as a direct and proximate cause of [Defendants'] breaches of express and implied warranties, [Plaintiffs] have suffered actual economic damages, and are threatened with irreparable harm by undue risk of physical injuries or death." Master Complaint, ¶ 208.

■ Defendants argue that Plaintiffs cannot show that they have been "damaged" by any breach of warranty, and therefore they cannot maintain an action under the Act. However, Plaintiffs clearly have alleged that they are damaged by the fact that the Tires and Explorers that they

---

**37.** The Tennessee courts have expressly recognized in other contexts the distinction between a tort action and a breach of warranty action. For example, in *McCroskey v. Bryant Air Conditioning Co.,* 524 S.W.2d 487 (Tenn. 1975), the plaintiffs brought a personal injury and wrongful death claim against a furnace manufacturer. The court held that the plaintiffs' tort and product liability claims accrued at the time the furnace malfunctioned and caused the plaintiffs' injuries; however, the plaintiffs' breach of warranty claims accrued at the time the defendant tendered delivery of the furnace.

**38.** As with the implied warranty claims, Defendants raise a myriad of other reasons why Plaintiffs' express warranty claims should be dismissed; these arguments are addressed below.

purchased are defective, because they paid for non-defective tires and vehicles. As explained in the preceding sections, this is all Plaintiffs are required to allege to maintain an action for breach of warranty under state law. There is absolutely nothing in the Act that suggests any additional requirement under the Act. Indeed, the legislative history of the Act suggests that this is the prototypical type of damage for which the Act was designed to provide a remedy. On this issue, the court's discussion in *Gorman v. Saf-T-Mate, Inc.*, 513 F.Supp. 1028, 1033 (N.D.Ind.1981), is instructive:

> [The Act's] central purpose is to create a new and more effective remedial mechanism for consumer claims involving comparatively small amounts of damages. Congress obviously felt that most aggrieved consumers go without redress because their individual claims are too insignificant to command representation by counsel or to warrant all the other expenses of invoking the judicial process. "Because enforcement of the warranty through the courts is prohibitively expensive, there exists no currently available remedy for consumers to enforce warranty obligations." S.Rep. No. 93-151, 93d Cong., 1st Sess. 7 (1973). Congress was also of the view that existing federal and state court procedural requirements offered too many impediments to the maintenance of consumer class actions. See H.R.Rep. No. 93-1107, 93d Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Ad. News 7702, 7724 (criticizing requirement of individual notice to potential class members). Accordingly, Congress sought to advance the federal policies expressed in the Warranty Act by fashioning a reme-

dial mechanism for small consumer claims. The court is authorized to award a reasonable sum to defray costs and attorney fees as part of a judgment in favor of a consumer. 15 U.S.C. § 2310(d)(2). This feature obviously was designed primarily for the benefit of consumers having small damage claims. In addition, contrary to the general rule in diversity actions, claims of joined plaintiffs, including members of a plaintiff class, may be aggregated to satisfy the $50,000 federal court jurisdictional amount, as long as each member of the plaintiff class is claiming at least $25. *Id.* § 2310(d)(3). The provision allowing aggregation of such small claims is yet another indication that the cause of action provision contemplates rather small damage claims. While the provisions for attorney fees and federal court class actions are the most readily apparent clues to the purposes of the cause-of-action provision, there is also some highly corroborative evidence in the report of the House Commerce Committee: "In this context, your Committee would emphasize that this section (2310(d)) is remedial in nature and is designed to facilitate relief which would otherwise not be available as a practical matter for individual consumers." H.R.Rep. No. 93-1107, 93d Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Ad. News 7702, 7724. There is only one variety of consumer complaint for which relief "would otherwise not be available," and that is the small warranty claim seeking repair, replacement or refund. That is the only kind of claim where the amount in controversy is ordinarily so small that individual private enforcement in the courts is "prohibitively expensive." [39]

---

**39.** The specific issue the *Gorman* court addressed was whether claims for personal injury caused by breach of warranty may be brought under the Act. The court held that they may not, *Gorman,* 513 F.Supp. at 1035,

although perplexingly Defendants cite this case for the proposition that an allegation of personal injury and/or damages is required under the Act. *See* Brief III at 60. Numerous

In other words, the Act was created, at least in large part, to provide a federal cause of action for consumers saddled with defective products who otherwise would not have suffered sufficient monetary damage to justify bringing a lawsuit, and therefore may not have had a remedy when their warrantor refused to honor the warranty by repairing or replacing the product or refunding the purchase price. That is precisely the position in which Plaintiffs allege they find themselves, and in spite of the cases that suggest otherwise,[40] their claims under the Act are not subject to dismissal because they have suffered no injury beyond not getting the non-defective product for which they paid.

G. Unjust Enrichment Claims

▮▮▮▮ Finally, in their ninth claim for relief, entitled Restitution/Disgorgement for Unjust Enrichment, Plaintiffs allege the following:

304. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefitted from the purchase and leasing of Ford Explorers by the Explorer Diminution Class, and the purchase of Tires, and the purchase and leasing of vehicles equipped with the Tires, by the Tire Plaintiffs and the Tire Class.

305. Defendants have voluntarily accepted and retained these profits and benefits, derived from the Plaintiffs and the Plaintiff Classes, with full knowledge and awareness that, as a result of Defendants' fraud and other conscious and intentional wrongdoing, Plaintiffs and the Plaintiff Classes were not receiving products of the quality, nature, fitness, or value that had been represented by Defendants or that Plaintiffs and the Plaintiff Classes, as reasonable consumers, expected.

306. By virtue of the conscious wrongdoing alleged in this Complaint, Defendants have been unjustly enriched at the expense of the Plaintiffs and the Plaintiff Classes, who are entitled to in equity, and hereby seek, the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

Defendants argue that Plaintiffs' lack of manifest injury precludes their claim for unjust enrichment. Specifically, they allege that because any defects in the Tires or Explorers have not manifested themselves, the "[p]laintiffs received tires and vehicles that have functioned and continue to function property." Brief III at 66.

▮▮▮▮ Under Tennessee law, in order to establish an unjust enrichment claim, Plaintiffs must demonstrate that (1) Plaintiffs conferred a benefit upon Defendants; (2) Defendants appreciated the benefit; and (3) it would be inequitable for Defendants to retain the benefit without paying for it. *See B & L Corp. v. Thomas &*

---

**40.** cases have agreed with the holding in *Gorman.* *See, e.g., Boelens v. Redman Homes, Inc.,* 748 F.2d 1058 (5th Cir.1984); *Bush v. American Motors Sales Corp.,* 575 F.Supp. 1581 (D.Colo.1984); *Hughes v. Segal Enterprises, Inc.,* 627 F.Supp. 1231 (W.D.Ark. 1986); *Schomber v. Jewel Cos., Inc.,* 614 F.Supp. 210 (N.D.Ill.1985).

**40.** *See Coghlan v. Aquasport Marine Corp.,* 73 F.Supp.2d 769 (S.D.Tex.1999), *aff'd,* 240 F.3d 449 (5th Cir.2001); *Verb v. Motorola, Inc.,* 284 Ill.App.3d 460, 472, 220 Ill.Dec. 275, 672 N.E.2d 1287, 1295 (1996); *Feinstein,* 535 F.Supp. at 602.

*Thorngren, Inc.,* 917 S.W.2d 674, 680 (Tenn.App.1995) (citing *Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150, 154 (1966)). Similarly, under Michigan law, "[t]he elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Barber v. SMH (US), Inc.,* 202 Mich.App. 366, 375, 509 N.W.2d 791, 796 (1993). In this case, Plaintiffs allege that Defendants sold them defective products for the price of non-defective products. If Plaintiffs can demonstrate as a factual matter that their Tires and/or Explorers are, in fact, defective and therefore worth less than they paid for them, then they (at least those who purchased their Tires or Explorers from one of Defendants or Defendants' agents) will have shown that Defendants obtained a benefit (a higher sale price) at the expense of Plaintiffs. The lack of a tread separation or a roll-over incident will not preclude Plaintiffs from maintaining at their unjust enrichment claim, and accordingly we hold that Defendants are not entitled to dismissal of this claim on that basis.

## IV. Application of Economic Loss Rule to Certain Plaintiffs

 As noted above, three of the named Plaintiffs Gary Gustafson, William Wehking, and Allan Simpson—allege that they have experienced tread separation incidents with their Firestone tires. Defendants concede that these plaintiffs have asserted an injury in the form of one or more damaged tires. They argue, however, that these plaintiffs' negligence claims are barred by the economic loss doctrine. We share the opinion that these negligence claims against Firestone are barred under Tennessee law, but hold that they may pursue their claims against Ford[41] under Michigan law.

 Under Tennessee law, the economic loss doctrine bars tort claims in which a plaintiff has suffered only economic damages. *Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 133 (Tenn.1995) ("Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence."). Damage to a defective product itself generally is treated as economic loss not recoverable in tort, but rather "most naturally understood as a warranty claim." *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 872–76, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (noting that "[t]he tort concern with safety is reduced when an injury is only to the product itself," and holding that "no products-liability claim lies in admiralty when the only injury claimed is economic loss," including damage to the defective product itself); *see also Restatement (Third) of Torts: Products Liability* § 21 cmt. d (1997) ("When a product defect results in harm to the product itself, the law governing commercial transactions sets forth a comprehensive scheme governing the rights of the buyer and seller.... These losses are not recoverable [in a tort action] under the rules of this Restatement.").[42]

---

**41.** Only the negligence claims of these three plaintiffs against Ford based upon the damage to their tires survive; as discussed above, no Plaintiff has alleged any damage to his or her Explorer as a result of the Explorer defect, indeed, plaintiff William Wehking owned a Ford pick-up truck, not an Explorer.

**42.** The Reporter's Note to comment d of the Restatement discusses this issue at length, noting that:

A strong majority of courts have taken the position that the key to whether products liability law or commercial law principles should govern depends upon the nature of the loss suffered by the plaintiff. If the plaintiff has suffered loss because the defective product simply malfunctioned or self-

While Plaintiffs assert that other states have held otherwise, especially in contexts in which the defective product poses a safety risk, they have cited no Tennessee case so holding, and our research has disclosed none. Plaintiffs further assert that Tennessee applies the economic loss doctrine only in the commercial context; however, nowhere is that distinction reflected in the relevant Tennessee cases. Accordingly, we conclude that, if faced with the question, the Tennessee Supreme Court, applying the economic loss doctrine, would determine that Tennessee law does not recognize a tort claim in cases in which a defect in a product causes damage only to the product itself. Plaintiffs Simpson, William Wehking, and Wilson may not maintain a negligence action against Firestone, and these claims are hereby **DISMISSED**.

Michigan, on the other hand, has consistently limited its application of the economic loss doctrine to the commercial context. *See, e.g., Neibarger v. Universal Coops., Inc.,* 439 Mich. 512, 486 N.W.2d 612, 618 (1992); *Republic Ins. Co. v. Broan Mfg. Co., Inc.,* 960 F.Supp. 1247, 1249 (E.D.Mich.1997) (Michigan's economic loss doctrine "has no application outside the commercial realm."). Accordingly, Ford's motion to dismiss the negligence claims of Plaintiffs Simpson, William Wehking, and Wilson against it is hereby **DENIED**.

## V. Defendants' Additional Arguments for Dismissal of Consumer Protection Claims

Defendants make a number of arguments to support their motion to dismiss the consumer protection claims. These arguments are addressed below.

### A. No Provisions for Class Action

 As noted above, the Master Complaint defines the various proposed classes as *"[a]ll persons and entities in the United States* who own or lease ... vehicles equipped with Firestone-brand ... tires" and *"[a]ll residents of the United States* who purchased, owned, or leased new or used Ford Explorers...." Master Complaint, ¶¶ 136, 161 (emphasis added). Defendants correctly note that Plaintiffs cannot maintain a class action under either the TCPA or the MCPA. Reply Brief III at 13–14. By its terms, the TCPA does not provide for class actions. Instead, the statute permits "[a]ny person who suffers an ascertainable loss of money or property ... as a result of the use or employment ... of an unfair or deceptive act or practice ... [to] bring an action *individually* to recover actual damages." Tenn.Code Ann. § 47–18–109(a)(1).

The terms of the Michigan consumer protection statute require more complex analysis. The MCPA provides for a "class action on behalf of persons residing or injured in this state...." Mich.Comp.Laws § 445.911(3). Because the statute limits class actions to Michigan residents and injurees, nationwide classes, as Plaintiffs have provisionally defined the classes, are not maintainable. Named Plaintiffs, none of whom are Michigan residents, do not contest that all members of the classes proposed in the Master Complaint were injured either in their home state or in the state where their vehicles and/or tires were purchased or leased. Furthermore, there is no allegation that any named Plaintiff purchased or leased her Explorer in Michigan.

destructed, the loss is deemed economic loss within the purview of the Uniform Commercial Code (UCC). Similarly, if the plaintiff suffers economic loss not caused by damage to the plaintiff's person or other property, that type of loss is to be governed by the UCC.
*Restatement (Third) of Torts: Products Liability* § 21, Reporter's Note to cmt. d.

For the above reasons, to the extent that Plaintiffs seek relief against Firestone and Ford "for all others similarly situated," Master Complaint, ¶ 312, Plaintiffs' Tenth Claim for Relief is hereby **DISMISSED.**

While class action suits cannot be brought against either Defendant, Plaintiffs may be able to maintain individual consumer protection claims against Ford and Firestone. In *Nesbitt v. American Community Mutual Ins. Co.*, 236 Mich. App. 215, 600 N.W.2d 427, 433 (1999), the Court of Appeals of Michigan permitted a non-resident plaintiff to sue his widow's health insurer because the health-insurer was "a Michigan-licensed company, operating from its home office within this state, engaging in trade or commerce." The named Plaintiffs may be able to prove a set of facts concerning conduct in "trade or commerce" at Ford's Michigan headquarters showing that the "controversy implicates the interests of [Michigan] sufficiently to bring the MCPA to bear." *See id.* at 433.

Likewise, in *Steed Realty v. Oveisi*, 823 S.W.2d 195, 198 (Tenn.Ct.App.1991), the Court of Appeals of Tennessee permitted out-of-state residents to bring a claim under the TCPA concerning out-of-state real estate purchases. The court found that it had jurisdiction because the defendant "advertised through both press and broadcast media in Tennessee, ... held the real estate closings in Tennessee, and ... transacted business from his office in Tennessee." *Id.* Plaintiffs have alleged that Firestone advertises in Tennessee and that Firestone conducts business from its offices there. Firestone, however, argues that the TCPA cannot "be applied ... to named [plaintiffs] outside of Tennessee who have had no dealings with Firestone

in Tennessee" because the *Steed* court found jurisdiction over the out-of-state plaintiff only because he closed the challenged real estate transaction at the defendant's office in Tennessee. Reply Brief III at 15 n. 12. It is not clear from the opinion in *Steed* that the factor noted by Firestone was decisive. In addition, the Court of Appeals was addressing subject matter jurisdiction specifically. Here, we are concerned with whether the TCPA regulates the conduct of Tennessee businesses, regardless of where the court enforcing the TCPA sits or the plaintiffs reside. Firestone's argument is not convincing on this point. Therefore, the named Plaintiffs may have individual claims under the TCPA and the MCPA.

**B. Purchase or Lease for Personal Use**

 Because out-of-state individuals can bring claims against Ford and Firestone under the MCPA and the TCPA, respectively, we address the remainder of Defendants' arguments for dismissing Plaintiffs' consumer protection claims. With respect to the MCPA,[43] Ford maintains that named Plaintiffs failed to alleged that they "purchased" or "leased" their vehicles or tires. Brief III at 4. The MCPA requires that the alleged deceptive or unfair act or practice occur in the "conduct of trade or commerce." Mich. Comp. Laws § 445.903(a)(1). " 'Trade or commerce' means the conduct of a business providing goods ... [for] sale [or] lease." Mich. Comp. Laws § 445.902(d). The Court finds that Plaintiffs satisfy the pleading requirements set forth by these two provisions of the MCPA. We note that for a number of Plaintiffs, the Master Complaint uses the magic words deemed necessary by Ford. *See, e.g.,* Master Com-

---

**43.** The TCPA is more broadly worded than the MCPA. Defendants' arguments in this section are not relevant to Plaintiffs' claims against Firestone under the Tennessee consumer protection statute.

plaint, ¶ 16 ("Plaintiff Eberly *leases* a 2000 Ford Explorer equipped with Firestone Wilderness AT P235/70R15 Tires.") (emphasis added). Furthermore, the remainder of Plaintiffs are alleged to "have" or to "own" Explorers. *See, e.g., id.* at ¶ 19 ("Plaintiff Moran *owns* a Ford Explorer with Firestone Wilderness AT Tires.") (emphasis added). Under Rule 12(b)(6), dismissal is appropriate only if it appears to a certainty that the plaintiff cannot establish any set of facts which would entitle him to the relief sought. *Hrubec v. National Railroad Passenger Corp.*, 981 F.2d 962, 963 (7th Cir.1992). A plaintiff is also entitled to all reasonable inferences to be drawn from the factual allegations in the complaint. *Holman,* 211 F.3d at 402. The named Plaintiffs who allege ownership ·of Explorers likely may be able to establish, consistent with ownership, that they purchased their vehicles, rather than, for example, that they received them as gifts from benevolent relatives. Indeed, the former scenario certainly is a more reasonable inference than the latter possibility.

Similar reasoning disposes of Ford's argument that the elements of an MCPA claim are not pled because Plaintiffs failed to allege purchase or lease of the vehicles "primarily for personal, family, or household purposes" as required by Mich. Comp. Laws § 445.902(d). Reply Brief III at 14. The typical allegation about the named Plaintiffs is as follows: "Plaintiff Cheryl Stuart resides in Charleston, West Virginia, and is a citizen of the State of West Virginia. Plaintiff Stuart owns a 1998 Ford Explorer that was equipped

with Wilderness AT Tires." Master Complaint, ¶ 28. None of the named Plaintiffs alleges that he or she is a business or uses the vehicles or tires for business purposes. While some Plaintiffs may use their vehicles primarily for non-household purposes, a "set of facts could be proved consistent with the allegations" that would state a claim under the MCPA by establishing personal use of the Explorers. *Hrubec,* 981 F.2d at 963. Under the system of notice pleading established by Federal Rule of Civil Procedure 8, such specificity is not required at this stage of the proceedings. Because we are addressing a motion to dismiss, Defendant's objection to the complaint on this ground is premature.

## C. Pleading Fraud with Particularity

 Defendants contend that Plaintiffs' claims under the state consumer protection statutes must be dismissed because they failed to plead their fraud-based claims with particularity. Brief III at 2. Because "the great majority of the specific practices enumerated in the [MCPA]—including those relied upon by [Plaintiffs]-involve fraud," *Mayhall,* 341 N.W.2d at 270, Plaintiffs' pleadings regarding these practices are subject to the requirements of Federal Rule of Civil Procedure 9(b).[44] Hence, "the circumstances constituting fraud or mistake [must] be stated with particularity." Fed.R.Civ.P. 9(b). Because this is a diversity suit in federal court, the standard for pleading requirements under Rule 9(b) is set by the Sev-

---

**44.** For instance, Plaintiffs allege that "Ford violated state consumer protection statutes when they falsely represented that the ... Explorers were of a particular standard or quality when they were not." Master Complaint, ¶ 308; *see* Mich. Comp. Laws § 445.903(1)(e) ("Representing that goods or services are of a particular standard, quality, or grade ... if they are of another [is unlaw-

ful.]"); Tenn.Code Ann. § 47–18–104(b)(7) ("Representing that goods or services are of a particular standard, quality or grade ... if they are of another [is prohibited.]"). As the court in *Mayhall* correctly noted, such an allegation concerns fraudulent conduct. 341 N.W.2d at 270 (citing Mich. Comp. Law 445.903(1)(e) and other sections as examples of prohibited practices involving fraud).

enth Circuit. *See Minger v. Green*, 239 F.3d 793, 800 (6th Cir.2001).

Applying this standard is complicated because the elements that must be pled with particularity depend on the elements of the underlying substantive statute, which here are the TCPA and the MCPA. *See General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir.1997) (holding that although pleading fraud under Rule 9(b) normally requires providing the "who, what, when, where, and how" of specific misrepresentations, certain details are not needed in a suit for constructive fraud because elements of constructive fraud exclude specific misrepresentation). Not surprisingly, there are no cases applying the Seventh Circuit's interpretation of Rule 9(b) to the TCPA or the MCPA. There is, however, one federal court in Michigan that considered the MCPA under Rule 9(b) as interpreted by the Sixth Circuit. In *Platsis v. E.F. Hutton & Co.*, 1985 WL 447, at *3 (W.D.Mich. Jan. 11, 1985), the court found a complaint under the MCPA sufficient because "it allege[d] the time, place and contents of the misrepresentation, the identity of the person making the misrepresentation, and the consequences of the misrepresentation." This standard is similar to the requirement in the Seventh Circuit that the plaintiff allege the "who, what, when, where, and how" of the fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Both precedents will guide our inquiry into whether Plaintiffs state their consumer protection claims with the requisite particularity.[45]

Contrary to Ford's contention, with one potentially correctable exception, Plaintiffs plead with particularity the "circumstances constituting fraud." Plaintiffs list a number of advertisements for Ford Explorers. Master Complaint, ¶ 124(a)-(m). Plaintiffs' allegations generally include a quote from the advertisement, the date the advertisement was issued, and the place of publication. *See, e.g., id.* at ¶ 124(a) ("In an advertisement in the December 31, 1999 issue of *People* magazine, the Explorer was advertised as 'provid[ing] exceptional control.' ") (alteration in original). Ford does not argue that it did not make these representations or that some other entity was responsible for placing the advertisements. Instead, Defendant suggests that such statements are "mere statements of opinion and thus do not rise to the level of fraud or fraudulent misrepresentation." Reply Brief III at 15 n. 14. However, Plaintiffs allege that "the Explorer ... [has] significant handling and stability defects." Master Complaint, ¶ 64. If Plaintiffs can establish facts consistent with that allegation, then the statement that the Explorer provides "exceptional control" could be a misrepresentation.

"The consequences of the misrepresentation" refer to reliance and injury. The issue of loss was decided in favor of Plaintiffs in the above discussion on injury as it relates to all of Plaintiffs' claims and will not be repeated here. Plaintiffs allege reliance generally, claiming that "[t]his recently discovered decade-long and continuing pattern of deceit led millions of consumers to purchase or lease Ford Explorers at prices far in excess of the values which would have been assigned to such vehicles had these dangers been disclosed." Master Complaint, ¶ 6. In a class action, this allegation would likely suffice. In *Dix v. American Bankers Life Assurance Co. of Florida*, 429 Mich. 410, 415 N.W.2d 206, 209 (1987), the Supreme Court of Michigan held "that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations [as long as] ... the class can establish

---

**45.** Our research revealed no cases applying Rule 9(b) pleading requirements to the TCPA.

that a reasonable person would have relied on the representations."

As discussed above, Plaintiffs here cannot bring a class action under the MCPA on behalf of a nationwide class. Therefore, they are subject to a higher pleading requirement than that set forth in *Dix.* Various Michigan cases have required plaintiffs to show that the allegedly false representation made by the defendant influenced their decision to enter into the contested transaction. In *Mayhall,* 341 N.W.2d at 270, the court characterized loss under the MCPA as the frustration of expectations brought about through reliance on defendant's false representations. The court in *Zine v. Chrysler Corp.,* 236 Mich.App. 261, 600 N.W.2d 384, 398 (1999), looked at the materiality of the defendant's representation in order to determine whether the plaintiff had an MCPA claim because one element of fraud is materiality. The *Zine* court determined that "a material fact for purposes of the MCPA would likewise be one that is important to the transaction *or affects the consumer's decision* to enter into the transaction." *Id.* (emphasis added). Furthermore, the language of the MCPA itself requires a causal link between the alleged misrepresentation or omission and the injury. Mich. Comp. Law § 445.911(2) ("a person who suffers a loss *as a result of a violation* of this act may bring an action to recover actual damages or $250.00, whichever is greater ...") (emphasis added).

One Tennessee case, *Ganzevoort v. Russell,* 1995 WL 623047, at *2–3 (Tenn.Ct. App. Oct. 25, 1995), concludes that the TCPA does not require plaintiffs to prove reliance. However, this same case dismisses the plaintiff's claim because the record did not indicate "how the deceptive act affected the [contested] trade." *Id.* at *2. The court reasoned that the deceptive act occurred only after the plaintiff had closed the transaction and that, therefore, the deceptive act could not have caused the plaintiff to enter into the transaction. Because we find the court's statement on reliance confusing in light of its reasoning and, ultimately, unconvincing, we shall rely on the statutory language. The TCPA uses "linking" language similar to that in the MCPA. It permits "[a]ny person who suffers an ascertainable loss ... *as a result of the use or employment by another person of an unfair or deceptive act* ... [to] bring an action ..." Tenn.Code.Ann. § 47–18–109(a)(3). We conclude that if the Supreme Court of Tennessee were applying this language to the situation before us, it would reach a conclusion similar to that reached by the Michigan courts interpreting the MCPA.

■■■■ Plaintiffs allege that Ford made various misrepresentations and omissions regarding the quality of Explorers. *E.g.,* Master Complaint, ¶ 308 ("[Defendants] concealed and suppressed facts material to the true characteristics, standards, and quality of these products."). For Plaintiffs to show that they suffered a loss as a result of a violation of one of the sections of the MCPA or the TCPA concerning misrepresentations and omissions, they must also establish that they took the allegedly false statements into account when making their decision to lease or purchase Explorers. Should the named Plaintiffs wish to prosecute their suits under the TCPA and MCPA individually, they shall be granted leave to amend the complaint in order to allege individual reliance. Therefore, Plaintiffs' Claims under the TCPA and the MCPA are hereby *DISMISSED* and Plaintiffs are *GRANTED* leave to amend the Master Complaint as discussed above.

## VI. Defendants' Additional Arguments for Dismissal of Express and Implied Warranty Claims

### A. Notice of Breach

U.C.C. § 2–607(3)(a)[46] provides: "Where a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Defendants argue that "[b]ecause Plaintiffs have not alleged that they provided the requisite notice under § 2–607, their breach of warranty claims must be dismissed." Brief III at 41.

Courts vary widely in their interpretations of § 2–607(3)(a). For example, some courts have held, with varying degrees of analysis, that the filing of a lawsuit can, at least in some instances, satisfy the notice of breach requirement. *See, e.g., In Re Latex Gloves Prods. Liab. Lit.,* 134 F.Supp.2d 415, 422–23 (E.D.Pa.2001); *Panda Capital Corp. v. Kopo Int'l, Inc.,* 242 A.D.2d 690, 692, 662 N.Y.S.2d 584, 586 (1997); *Mullins v. Wyatt,* 887 S.W.2d 356, 358 (Ky.1994); *Hudson v. Gaines,* 199 Ga. App. 70, 403 S.E.2d 852, 854 (1991); *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Ins. Co.,* 42 Ohio St.3d 40, 537 N.E.2d 624, 638 (1989); *Shooshanian v. Wagner,* 672 P.2d 455, 463 (Alaska 1983). Other courts have reached the opposite conclusion. *See, e.g., Brookings Municipal Utilities, Inc. v. Amoco Chem. Co.,* 103 F.Supp.2d 1169, 1176 (D.S.D.2000) (citing *Hepper v. Triple U Enterprises, Inc.,* 388 N.W.2d 525, 529 (S.D.1986)); *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 590 (1996) (holding that under Illinois law only a consumer buyer who suffered a personal injury may satisfy § 2–607 by filing suit); *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 327 A.2d 502, 513–14

(1974). The parties have not cited any case in which a Tennessee or Michigan court has addressed this issue, and our own research has unearthed none. Therefore, we must determine into which camp the Tennessee and Michigan Supreme Courts would fall if confronted with this issue.

In our view, the more well-reasoned cases are those that hold that the filing of a complaint may be sufficient to satisfy the notice of breach requirement of § 2–607 under certain circumstances. While Defendants refer to § 2–607(3)(a) as establishing a "pre-litigation notice" requirement, the plain language of the statute does not require that notice be given prior to filing suit, only that notice be given within a reasonable time. Neither are the main policies behind the notice of breach requirement-protecting defendants from stale claims, "open[ing] the way for normal settlement through negotiation" (Comment 4 to U.C.C. § 2–607), and giving the defendant the opportunity to correct any defect-necessarily frustrated if notice is given by filing suit. Obviously, the first policy is promoted equally whether early notice is given by informal letter or the filing of a lawsuit. As to the policy of promoting settlement, we do not believe that filing suit is an impediment to successful settlement negotiations. "To the contrary, the prospect of going to trial is often a powerful incentive to a defendant to investigate the claims against it and to arrive at a reasonable agreement." *Shooshanian,* 672 P.2d at 462–63. Finally, in cases such as this one (assuming, as we must, that the facts as pled are true), where Defendants had ample notice of the defect in the products[47] well before the

---

**46.** Mich. Comp. Laws § 440.2607(3)(a); Tenn.Code Ann. § 47–2–607(3)(a).

**47.** Defendants, citing to *Connick,* 221 Ill.Dec. 389, 675 N.E.2d at 590, point out the important distinction between notice of problems with a product in general (in *Connick,* "safety concerns regarding the Samurai") and notice of trouble "with the particular product purchased by a particular buyer." However, in this case Plaintiffs allege in the Master Complaint that *all* of the Tires and Explorers are defective and that Defendants were aware of that fact well before Plaintiffs filed suit, and at

lawsuit was filed, and, indeed, allegedly well before Plaintiffs themselves did, and chose not to remedy those defects, no purpose would be served by requiring pre-litigation notice.[48] Therefore, we conclude that a per se rule that the filing of a lawsuit can never satisfy the notice of breach requirement would be improper, and we find nothing in either Michigan or Tennessee law suggesting that the Supreme Courts of those states would not also so hold.[49] Whether § 2–607(3)(a) was satisfied in this case involves the resolution of questions of fact; however, it is clear that there are facts consistent with the Master Complaint that, if ultimately proven, will support a finding that the Plaintiffs provided the requisite notice of breach to the Defendants by filing suit. Accordingly, the Plaintiffs' claims will not be dismissed on the basis that they did not satisfy § 2–607(3)(a).

## B. Statute of Limitations

 Defendants assert that under the applicable statute of limitation, the breach of express and implied warranty claims of Plaintiffs Richard Glover, Allan Simpson, Jane Lill,[50] Susan Grayson, Dawn Whorl, and John Dovich are time barred. Plaintiffs argue, and Defendants do not dispute, that under Indiana's choice of law rules, Indiana's statutes of limitations apply to all of the state law claims in this case. *See Singletary v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,* 9 F.3d 1236, 1242 (7th Cir.1993) (citations omitted) ("[F]or purposes of choice of law statutes of limitations are treated as procedural rules ... [s]o the forum state ... can and does supply the complete statute of limitations for use in this case...."); *Autocephalous Greek–Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.,* 717 F.Supp. 1374, 1385 (S.D.Ind.1989) (citations omitted) ("Because in Indiana statutes of limitations are procedural in nature, Indiana choice-of-law rules state that the statute of limitations of the forum state, Indiana, will apply."), *aff'd,* 917 F.2d 278 (7th Cir.1990); *but see Jean v. Dugan,* 20 F.3d 255, 259 (7th Cir.1994) (treating statute of limitations as substantive for choice of law purposes).

The statute of limitations for a breach of warranty action in Indiana is four years.

---

this stage these allegations must be accepted as true.

**48.** The Court recognizes that there is split authority on the issue of whether actual notice of defendants of problems with a product is sufficient to satisfy § 2–607. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* 611 n. 1 (4th Ed.1995) (collecting cases and noting that "[t]he majority of cases find actual notice to suffice ... [but s]everal cases ... require more than actual notice"). Thus, whether a defendant had actual notice before the plaintiff filed suit is one factor which should be considered in determining whether the lawsuit was adequate notice in a given case, regardless of whether actual notice by itself is sufficient to constitute notice.

**49.** Indeed, we found two cases from Tennessee involving other notice provisions that lend some support to this determination. In *Moon v. Auto–Owners Ins. Co.,* 736 S.W.2d 92, 94

(Tenn.1987), the court addressed the issue of whether the filing of a lawsuit satisfied Tenn. Code Ann. § 50–6–201, which provides, in relevant part, that "no [worker's compensation benefits] shall be payable under the provisions of this chapter unless ... written notice is given the employer within thirty (30) days after the occurrence of the accident." The court held that it did. *Id.* Similarly, in *Wal–Board Supply Co., Inc. v. Daniels,* 629 S.W.2d 686, 688 (Tenn.App.1981), the court held that the requirement in a bond that "[n]otice of claims must be given" within a certain time period was satisfied when the plaintiff filed suit within that time period.

**50.** Defendants further allege in a footnote that these three Plaintiffs' unjust enrichment claims also are barred by Florida's four-year statute of limitations for such claims. Brief III at 69 n. 65.

Ind.Code § 26–1–2–725(1).[51] As noted above, a breach of warranty cause of action accrues when tender of delivery is made. Ind.Code § 26–1–2–725(2). Defendants assert that because each of the six Plaintiffs listed above owned or owns a model-year 1995 or earlier Explorer, and each filed suit in 2000, each failed to file his or her claim within the four-year limitation period, and therefore those warranty claims are time barred.[52]

Plaintiffs counter that the statute of limitations was tolled due to Defendants' fraudulent concealment of the defects in the Tires and the Explorers.[53] Defendants argue that Plaintiffs have failed in two distinct ways to plead the facts necessary to support a finding of fraudulent concealment:[54] first, they have not alleged that Plaintiffs exercised reasonable care and due diligence in detecting the fraud; and second, they have not alleged that Defendants actively concealed the defects, rather than simply failed to disclose them.[55] Plaintiffs were not required to plead with such specificity under the Federal Rules of Civil Procedure, however. *See Kaplan v. Shure Bros., Inc.*, 153 F.3d 413, 419 (7th Cir.1998). Instead, a complaint need only give the defendant "at least minimal notice of the claim." *Id.* (citing Fed.R.Civ.P. 8(a)(2) and *Jackson v. Marion County*, 66 F.3d 151, 154 (7th Cir.1995)). Indeed, as noted above, to succeed on a motion to dismiss, a defendant must show that there is no set of facts consistent with the plaintiffs' allegations that would entitle the plaintiff to relief. *Id.; Holman*, 211 F.3d at 402. Whether or not the facts contained in the Master Complaint would, by themselves, support a finding of fraudulent concealment is irrelevant; the relevant question is whether there is any set of facts consistent with the Master Complaint that will support such a finding if Plaintiffs ultimately can prove them. The answer to that question is undeniably yes; accordingly, Plaintiffs' warranty claims will not be dismissed based upon the statute of limitations contentions.

## VII. Defendants' Additional Arguments for Dismissal of Breach of Implied Warranty of Merchantability Claims

Defendants argue that Plaintiffs have failed to plead properly their claims for breach of the implied warranty of merchantability for several reasons, each of which is addressed below.

**51.** The identical statute is found in Michigan, Mich. Comp. Laws § 440.2725(1), and Tennessee, Tenn.Code Ann. § 47–2–725(1).

**52.** For purposes of this discussion only, we accept Defendants' implicit assertion that the model year represents the latest point at which Plaintiffs purchased their Explorers, although that may not be accurate.

**53.** Indiana Code § 34–11–5–1 codifies the doctrine of equitable tolling because of fraudulent concealment: "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action."

**54.** The Court at this point offers no opinion on whether Defendants' representation of Indiana law respecting fraudulent concealment is correct, as it is not necessary to do so to resolve the instant motion.

**55.** We note that Plaintiffs do plead at least one specific instance of active concealment by Ford when, in ¶ 93 of the Master Complaint, they allege that Ford "deceptively labeled its Venezuela recall a 'customer notification enhancement action' rather than acknowledging that it was actually recalling tires it knew had the potential for sudden and catastrophic failure" in order to prevent United States Explorer owners from learning of the problems with the Tires.

### A. Plaintiffs' Failure to Allege Vertical Privity

█ Defendants argue that Plaintiffs' implied warranty claims must be dismissed because the Master Complaint does not allege that each Plaintiff was in vertical privity with the Defendants. Specifically, Defendants object to the fact that Plaintiffs "do not allege that they purchased or leased their vehicles and tires directly from Ford or Firestone; nor do they allege that they acquired their vehicles or tires from dealers, let alone that the dealers were agents of Ford or Firestone." Reply Brief III at 23–24. Again, however, Plaintiffs were not required to include such allegations in their complaint under our notice pleading system. *See Kaplan*, 153 F.3d at 419. Therefore, the court in *Kaplan* held that "[t]he fact that [the plaintiff] did not plead facts showing that he was in privity with [the defendant] ... [did not] bar his claim as a matter of law; as long as he put [the defendant] on notice of the nature of his claim, his case can proceed." *Id.* Here Defendants certainly cannot in good faith argue that the Master Complaint does not put them on notice of the nature of Plaintiffs' claims against them. Further, there obviously are facts consistent with the allegations in the Master Complaint that Plaintiffs can endeavor to prove which will satisfy the privity requirement. Accordingly, the implied war-ranty claims in the Master Complaint will not be dismissed for failure to plead vertical privity.

### B. Durational Limits of Implied Warranty Obligations

█ In ¶ 205 of the Master Complaint, Plaintiffs assert:

> Any limitations periods, limitations on recovery, or exclusion of implied warranties in [Defendants'] express warranty are unconscionable within the meaning of section 2–302[56] of the Uniform Commercial Code, and therefore are unenforceable, in that, among other things, the Tires and Explorers contain latent defects of which [Defendants] were aware at the time of sale, and buyers lacked a meaningful choice with respect to the terms of the express written warranties due to unequal bargaining power and a lack of warranty competition among dominant tire and automobile manufacturers.

In their motion to dismiss, Defendants dispute the accuracy of this assertion, arguing that the durational limits are enforceable because they comply with U.C.C. § 2–316 and, according to a leading U.C.C. treatise, there are "no cases that find a disclaimer conforming to 2–316 to be unconscionable." Brief III at 54 (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* 675 (4th Ed.1995)).[57] The Court assumes that De-

---

**56.** U.C.C. Section 2–302(1) (Mich. Comp. Laws § 440.2302(1); Tenn.Code Ann. § 47–2–302(1)) provides:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause so as to avoid any unconscionable result.

**57.** U.C.C. § 2–316(2) (Mich. Comp. Laws § 440.2316(2); Tenn.Code Ann. § 47–2–316(2)) sets forth the requirements which

must be satisfied for an exclusion or modification of the implied warranty of merchantability to be enforceable. Courts and commentators alike have struggled with the intricacies of this and other U.C.C. provisions related to warranty disclaimers and unconscionability. Indeed, the two authors of the treatise cited by Defendants, Professor Summers and Professor White, disagree with one another as to some of the finer points. *See* White & Summers, *supra*, at 677 ("One of us believes that these courts misread the intention of the drafters and that the drafters never intended 2–302 to be an overlay on the disclaimer provisions of 2–316."). We view it as neither

fendants believe that some or all of Plaintiffs' breach of implied warranty claims are barred by the durational limits contained in Defendants' express warranties. However, Defendants do not make this argument explicitly in their motion to dismiss, perhaps because the Master Complaint-quite understandably-does not contain all of the facts necessary to determine which Plaintiffs fall into that category. Rather, Defendants simply argue that Plaintiffs' assertion of unconscionability "must fail." Brief III at 55. While Defendants' argument raises several interesting legal issues that likely will ultimately need to be resolved, the Court cannot resolve them in the vacuum in which they have been presented. Paragraph 205 by itself does not purport to assert a claim for relief, and therefore is not the proper subject of a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state such a claim. Further, even if Defendants had raised the issue of the enforceability of the durational limits in the proper context, as a defense to certain Plaintiffs' implied warranty claims, U.C.C. § 2–302(2)[58] provides that "[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." Therefore, we regard it as inappropriate to attempt to resolve the issue of unconscionability on the pleadings alone. *See Carlson v. General Motors Corp.*, 883 F.2d 287, 293 (4th Cir.1989) (holding that it was error to determine that durational limitations were reasonable

and conscionable based solely on the pleadings and that the court "will be equipped to address that question only *after* plaintiffs have had an opportunity-whether in connection with a motion for summary judgment or at trial-to present evidence that, for example, they had no 'meaningful choice' but to accept the limited warranties, or that the durational limitations 'unreasonably' favored the defendant"). Accordingly, Defendants' motion to dismiss Plaintiffs' claims for breach of implied warranty is hereby ***DENIED.***

## VIII. Defendants' Additional Arguments for Dismissal of Express Warranty Claims

In the Master Complaint, Plaintiffs allege that Defendants "expressly warrant[ed] the Tires and Explorers to be free of defects at the time of delivery" and that Defendants breached those warranties by selling defective Tires and Explorers. Master Complaint, ¶¶ 314–15. Ford provides a written warranty along with each new Explorer that it sells, in which it warrants that its dealers will "repair, replace or adjust all parts (except tires) . . . that are defective in factory-supplied materials or workmanship for 3 years or 36,000 miles (whichever occurs first)."[59] Ford asserts that because "no named Plaintiff alleges that he or she ever presented a covered vehicle to an authorized Ford dealer for warranty repair within the warranty period and was denied service," Brief III at 37, no Plaintiff asserts a valid claim for breach of Ford's written warranty. Similarly, Firestone's written warranty provides that it will replace any war-

---

necessary nor prudent for us to weigh in on these issues at this point.

**58.** Mich. Comp. Laws § 440.2302(2); Tenn. Code Ann. § 47–2–302(2).

**59.** Because Plaintiffs did not attach copies of the relevant Ford written warranties to the

Master Complaint, Ford quite properly submitted them with its motion to dismiss. The precise language of the warranties varies slightly between model years, but the substance is the same.

ranted tire that has "become unusable for any reason within the manufacturer's control" as long as the tire has not worn down to 2/32nds of an inch of tread depth. Firestone argues that none of the named Plaintiffs alleges that "he or she satisfied the minimum preconditions for obtaining a replacement tire under Firestone's warranty," and therefore each has failed to state a claim for breach of written warranty. These arguments made as part of a motion to dismiss are without merit, inasmuch as under the Federal Rules, Plaintiffs were not required to include such specific factual allegations in their complaint. Whether Plaintiffs satisfied any obligations they may have had under Defendants' written warranties is a factual question that is not properly addressed by a motion to dismiss premised, as it is, on a lack of factual detail. Further, Plaintiffs argue that Defendants' limitations of remedies in their written warranties fail of their essential purpose, and therefore their remedies for breach of warranty are not limited to repair or replacement;[60] this, too, raises factual issues that must be resolved in a context other than a motion to dismiss.

In addition to the written warranties provided by Defendants, Plaintiffs also allege that Defendants expressly warranted the Explorers and the Tires to be tough and rugged by describing the Explorer as a "sport utility vehicle," and giving the Tires names such as AT ("all terrain") and "Wilderness," and that Defendants breached these "core description warranties" when they sold defective tires and vehicles that were anything but tough and rugged. We agree with Defendants that these descriptions alone, as a matter of law, are not sufficient to create any express warranty regarding the safety or performance of the Tires and the Explorer. However, Plaintiffs also allege that each Defendant created an express warranty regarding its product's safety with statements it made in its advertising campaigns. Defendants do not argue that an advertising campaign, as a matter of law, can never create an express warranty;[61] rather, they argue that the particular advertising statements identified in the Master Complaint do not constitute warranties. Whether Defendants' advertisements contained statements sufficient to create an express warranty, whether any such warranty was the basis of the bargain between any given Plaintiff and Defendant(s), and whether Defendant(s) breached any such warranty are all questions of fact that cannot be resolved by a motion to dismiss. Accordingly, Defendants' motion to dismiss Plain-

---

**60.** U.C.C. § 2–719(2) (Mich. Comp. Laws § 440.2719(2); Tenn.Code Ann. § 47–2–719(2)) provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided [in other provisions of the U.C.C.]." Plaintiffs argue that the Defendants' remedies have failed of their essential purpose because (1) Ford's promise to repair or replace any defective part of the Explorer is worthless because the Explorer's defect cannot be corrected by repairing or replacing any defective part; and (2) Firestone has refused to replace some of the defective tires, and in instances where it has replaced tires it has used equally defective replacement tires.

**61.** Presumably that is because it is clear that under some circumstances warranties can be created through advertising. *See Triple E, Inc. v. Hendrix & Dail, Inc.,* 344 S.C. 186, 543 S.E.2d 245, 247 (2001) (citing: *Gherna v. Ford Motor Co.,* 246 Cal.App.2d 639, 55 Cal. Rptr. 94 (1966); *Torres v. Northwest Engineering Co.,* 86 Hawai'i 383, 949 P.2d 1004 (1997); *Scheuler v. Aamco Transmissions, Inc.,* 1 Kan.App.2d 525, 571 P.2d 48 (1977); *Courtney v. Bassano,* 733 A.2d 973 (Me.1999); *Interco, Inc. v. Randustrial Corp.,* 533 S.W.2d 257 (Mo.App.1976); *Daughtrey v. Ashe,* 243 Va. 73, 413 S.E.2d 336 (1992); *Arrow Transp. Co. v. A.O. Smith Co.,* 75 Wash.2d 843, 454 P.2d 387 (1969)); *see also* White & Summers, *supra,* at 494–95 (collecting cases that have so held).

tiffs' claims for breach of express warranty is hereby **DENIED.**

## IX. Defendants' Additional Arguments for Dismissal of Magnuson Moss Warranty Act Claims

Because Plaintiffs' claims under the Magnuson Moss Warranty Act are derivative of their state law warranty claims, Defendants argue that the Magnuson Moss claims must be dismissed for the same reasons as the state law claims. Accordingly, since the motion to dismiss the state law warranty claims is denied, the motion to dismiss the Magnuson Moss Act claims must also be and is hereby **DENIED.**

## X. Defendants' Additional Arguments for Dismissal of Unjust Enrichment Claims

 As noted above, Plaintiffs allege that Defendants have been unjustly enriched by selling them defective Explorers and Tires for the price of non-defective Explorers and Tires. Defendants move to dismiss Plaintiffs' unjust enrichment claim on the ground that Plaintiffs also have alleged that written contracts (in the form of written warranties) existed between the parties, and unjust enrichment is a quasi-contractual remedy which may only be invoked in the absence of an express contract. Plaintiffs counter that they are permitted under Federal Rule of Civil Procedure 8(e)(2) to allege alternative inconsistent theories in their complaint. Rule 8(e)(2) provides:

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative state-

ments. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Defendants correctly point out that the Master Complaint does not set out explicitly the alternative nature of the claims for breach of express warranty and unjust enrichment, but such is not required under Rule 8. A complaint "need not use particular words to plead in the alternative, [but] must use a formulation from which it can be reasonably inferred" that theories are intended as alternatives. *See Holman,* 211 F.3d at 407. There is nothing unreasonable about such an inference in this case. Therefore, while we agree that the Master Complaint could have been more artfully drafted to expressly plead the two claims in the alternative, we will not dismiss the unjust enrichment claim for such a failure to do so.

 Defendants also attack Plaintiffs' unjust enrichment claim on the merits. As set forth above, under both Michigan and Tennessee law, in order to state a claim for unjust enrichment, Plaintiffs must prove that Defendants have received and retained a benefit from Plaintiffs. Defendants argue that, as to all of the Tires that have been recalled, Plaintiffs have failed to allege, and cannot prove, that Defendants have retained any benefit because Defendants have replaced the Tires at considerable cost to them. However, Plaintiffs allege that some or all of the replacement tires offered during the recall suffer from the same defect. Whether this is true, and whether any actions taken by Defendants have divested them of any benefit they received from Plaintiffs from the sale of allegedly defective products, are questions of fact that cannot be resolved at this time or in this context. Because there is at least one set of facts, consistent with the

Master Complaint, which, if proven, would support Plaintiffs' unjust enrichment claim, that claim is not subject to dismissal, and Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is hereby *DENIED.*[62]

### *CONCLUSION*

For the reasons set forth above, the Court *DENIES* Defendants' Motion to Dismiss Plaintiffs' First, Ninth, Eleventh, and Twelfth Claims for Relief. The Court further *GRANTS* Defendants' Motion to Dismiss Plaintiffs' Second through Seventh, Thirteenth, and Fourteenth Claims for Relief. Plaintiffs' Tenth Claim for Relief is *DISMISSED* only to the extent set forth more specifically above.

It is so ORDERED this 27th day of July 2001.

---

**62.** Defendants assert an additional ground for dismissal under Arizona, Florida, Illinois, Louisiana, and Ohio law which the Court need not address.